Jimmie HUFF, Plaintiff–Appellant,

v.

UARCO, INCORPORATED,
Defendant–Appellee.

William M. SCHOOLMAN,
Plaintiff–Appellant,

v.

UARCO, INCORPORATED, and the
Trustees of the UARCO Retirement
Plan, Defendants–Appellees.

Nos. 96–2361, 96–2914.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 14, 1997.

Decided Aug. 6, 1997.

Charles D. Boutwell, McCullough, Campbell & Lane, Chicago, IL, John F. O'Meara

(argued), Park Ridge, IL, for Plaintiffs–Appellants.

Gary S. Kaplan (argued), Jeffrey K. Ross, Theodore C. Stamatakos, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendants–Appellees.

Gwendolyn Young Reams, Carolyn L. Wheeler, Robert J. Gregory, C. Gregory Stewart, Equal Employment Opportunity Commission, Office of General Counsel, Washington, DC, for Amicus Curiae.

Before ESCHBACH, KANNE and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Jimmie Huff and William Schoolman had been working for UARCO for twenty-four years and thirty-two years respectively when UARCO demoted them from their long-held supervisory positions. Both Huff and Schoolman claimed the demotions were the result of age-related bias. Schoolman additionally claimed that UARCO discriminated against him because of a perceived disability, and discriminated against him on the basis of age in the provision of his pension benefits. The district court[1] granted summary judgment in favor of defendant UARCO in both cases, ruling that neither plaintiff had enough evidence to raise a genuine issue of material fact for trial. Because we find admissible some of the evidence excluded by the district court, we reverse the grants of summary judgment on the age bias claims and remand for trial. We affirm the grant of summary judgment in favor of UARCO on Schoolman's disability claim.

## I.

UARCO is in the business of developing and producing business forms at its Watseka, Illinois plant. The plant is divided into five functional departments: composing, preparatory, press, finishing and warehouse. Schoolman and Huff were employed as line workers, and were promoted to supervisory positions in 1965 and 1977 respectively. In May 1993, Schoolman herniated two discs in his back, and was off work until early August 1993. When he returned, he temporarily used an electric cart to travel around the plant. His doctor directed him to refrain from heavy lifting, twisting his back, and standing on cement for long periods of time. His position as supervisor required no heavy lifting, twisting or standing, and he was able, in his injured condition, to perform his supervisory duties. Huff had suffered a minor stroke in 1991, but recovered quickly and returned to work where he, too, was able to perform all of his supervisory duties. No one disputes that Schoolman and Huff were satisfactorily performing their duties as supervisors at the time of their demotions.

In the fall of 1993, Ron Trillet, the plant manager, decided that the finishing department, with five supervisors, was top heavy compared to the press department, which functioned adequately with only three supervisors. In order to cut costs and reduce the number of supervisors in the finishing department, Trillet decided to downsize the department by demoting two supervisors. In order to determine who to demote, Trillet asked Richard Rhodes, the general supervisor of that department, to rank the finishing department supervisors. Rhodes, who had directly supervised Huff and Schoolman for some time, ranked the five finishing department supervisors in the following order: 1) Landry, age 48, rated excellent; 2) Paro, age 56, rated above average; 3) Schoolman, age 55, rated average; 4) Huff, age 56, rated average; and 5) Nasers, age 48, rated below average.

Apparently not satisfied with the results of Rhodes' ranking, Trillet sought input from Robert Williams, UARCO's Human Resources Director. Williams, in turn, solicited the opinions of Fred Focken and James Reutter, two general supervisors who had no direct supervisory contact with Huff and

---

1. Huff's case was assigned to Judge Milton I. Shadur, and Schoolman's case to Judge David H. Coar. Because Schoolman and Huff presented nearly identical evidence in support of their cases, and the cases raised nearly identical legal issues, Judge Coar's opinion closely tracks that of Judge Shadur. We will refer to the two courts collectively as the "district court" and will note any differences between them when necessary.

Schoolman. Focken used the opportunity to "put in a good word" for Nasers, and to say that he thought Huff had come to work intoxicated one night. (Discovery showed that on the night in question, Huff had suffered the stroke mentioned above, which caused him to appear intoxicated). Reutter had no comment on Huff but opined that Schoolman was a poor supervisor. Neither provided a formal ranking as Rhodes had done. Nasers, who came in dead last in Rhodes' ranking and was rated below average, was subsequently transferred to the press department as a supervisor, and Dean Schippert, a 51 year old press department supervisor, was transferred to the finishing department. Schoolman and Huff were demoted down to line positions. Schoolman eventually resigned because his new position proved too harmful to his back, and Huff remains on the job.

According to Schoolman and Huff, their demotions were the only "competitive" demotions at the plant that anyone could remember. All other demotions had been made on a seniority basis. In fact, plaintiffs point to UARCO's Industrial Relations Manual as the source of company policy utilizing seniority as the sole criteria for demotions. Furthermore, ten of the eleven workers who were terminated by UARCO in 1993 were over forty. (The record does not reflect whether older workers were disproportionately affected). In that same year, the company sought the early retirement of four older management level employees, and although the company claimed it was undergoing a reduction in force, the number of employees at the plant actually increased during that time period. Trillet, who made the decision to demote Schoolman and Huff, made age-biased comments during negotiations with the union six months before the demotions (although Schoolman and Huff were not union employees), and when the company began to recall laid-off union workers approximately one year after plaintiffs' demotions, it failed to recall older workers who had seniority, even though it had a contractual obligation to do so. Following the demotions, a younger worker with less seniority, Allison, was promoted to the position of supervisor, even though plaintiffs were qualified and had seniority. Schoolman and Huff also contend that although supervisors were interchangeable among departments, only the finishing department supervisors were ranked, leaving unconsidered for demotion several younger supervisors with less seniority. Plaintiffs argue that this all points to the conclusion that they were demoted on the basis of age in violation of the ADEA.

Schoolman additionally claimed that he was demoted at least in part because of UARCO's perception that he was disabled after his back problems began. He cites the fact that all supervisors over the age of fifty-four who had health problems were demoted, including himself, Huff, and Paro, who had had a heart attack.[2] Furthermore, all of the demoted workers were given more physically demanding jobs. Finally, he points to UARCO's allegedly insensitive treatment of Rhoda Minard, another worker with back and leg problems, who was not given a chair to sit on when her job allowed sitting, or a mat on which to stand to alleviate her problem. Schoolman also claimed that UARCO wrongfully withheld the payment of pension benefits from him on the basis of age. UARCO's pension policy allowed any workers with fewer than ten years' experience or those workers who had more than ten years' experience but who were not yet fifty-five years old to withdraw their pensions in a lump sum at termination. But those who worked for UARCO for more than ten years, and who were older than fifty-five were not allowed a lump sum payout, but were required to take their pension payment over time, on an actuarially equivalent basis.

### A.

Defendant UARCO moved for summary judgment against both defendants, arguing that neither had direct evidence of discrimination, and that both failed to rebut UARCO's facially non-discriminatory reasons for

---

**2.** Paro had been a general supervisor before his heart attack, and was demoted to the position of line supervisor.

the demotions. UARCO also argued that Trillet's statements during the union negotiations were irrelevant because Schoolman and Huff were not union employees. Further, UARCO claimed, the Industrial Relations Manual applied only to nonsupervisory personnel, and only to layoffs, not to demotions. UARCO also objected to the relevance of the failure to recall older union workers between ten and twenty months after the demotions. On Schoolman's individual claims, UARCO disputed that it had been insensitive to Minard's physical condition or that it had considered the health of any of the demoted employees in making the decisions. UARCO contested whether these facts, even if true, could amount to a claim of disability discrimination. Finally, UARCO contended that its pension plan was not discriminatory as a matter of law under *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

## B.

The district court ruled first in Huff's case. The court addressed the "direct proof" method first, finding that Huff had presented no "smoking gun" evidence of discriminatory intent, and no circumstantial evidence to show that UARCO was engaged in a plot to eliminate older workers. The court refused to consider as direct evidence the statements made by Trillet during union negotiations because Huff was not a union employee. Characterizing the statements as "far afield" and "difficult to interpret," the court found they dealt with layoffs and bump rights, not demotions. Finding that this was as close as Huff came to a direct case, and finding that it was not close enough to raise a genuine issue of material fact for trial, the court rejected the direct case.

In analyzing Huff's indirect claim, the court noted that UARCO conceded that Huff had made out a *prima facie* case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). That is, Huff showed that he was in the protected class (workers over forty), he was

performing his job satisfactorily (UARCO conceded this), he suffered an adverse employment action (he was demoted), and younger employees were treated more favorably (Nasers, Landry and younger supervisors in other departments were not demoted). The court then accepted UARCO's facially non-discriminatory explanation for the demotion, that it wanted to save money by reducing the overall number of supervisors in the finishing department, and that it selected these two supervisors for demotion because it wanted to retain the strongest possible overall management team across departments. This shifted the burden back to Huff to show that these reasons were pretext. The court found that Huff fell far short of the mark because everyone who participated in the ranking, including Rhodes, who Huff conceded knew his work the best, ranked him in the bottom two of the five finishing department supervisors. The court refused to credit Huff's argument that UARCO had violated its own company policy of demoting workers strictly on a seniority basis. Instead, the court found, the Industrial Relations Manual, which allegedly created this seniority policy, pertained only to non-supervisory employees, and applied to layoffs and bump rights only and not to demotions. The court summarily discredited the remainder of Huff's evidence and dismissed the ADEA claim.[3]

## C.

In Schoolman's case, the district court noted that Schoolman forewent the direct proof case entirely, claiming instead an indirect *McDonnell Douglas* case. As with Huff, UARCO conceded that Schoolman presented a *prima facie* case of age discrimination, and the district court once again accepted UARCO's facially neutral explanation for its decision to demote this particular worker, shifting the burden back to Schoolman. The court summarized Schoolman's evidence of pretext as follows: first, that it was not reasonable for Trillet to consider the rankings of anyone other than Rhodes, his direct supervisor, in determining who to demote;

---

**3.** The court also dismissed Huff's Illinois Human Rights Act claim because Huff failed to present evidence that the Illinois Human Rights Commis-

sion had issued a final order on his complaint. Huff did not appeal the dismissal of that claim, and thus we do not address it.

second, that Rhodes' ranking of him as third showed he should not have been demoted; third, that UARCO violated its own policy of seniority-based demotions as set out in the Industrial Relations Manual when it demoted Schoolman using competitive criteria; fourth, that UARCO had shown a pattern of discrimination by refusing to recall the older, more senior nonsupervisory union workers from layoff (as required by contract), and by transferring younger, less experienced non-union workers into their positions. The court found that even if these contentions were true, none would be sufficient to establish pretext. Following the lead of the court in Huff's case, the district court in Schoolman found that the Industrial Relations Manual applied only to non-supervisory personnel. Similarly, the court held that the company's actions towards the union workers were not relevant to the decision to demote the supervisors.

On Schoolman's disability claim, the court ruled that Schoolman had failed to show that he was a member of the class that ADA protects. That is, he failed to show that UARCO perceived him as disabled in the sense that the ADA requires—that he was perceived as incapable of performing work across the spectrum of the same or similar jobs. The court rejected as irrelevant Schoolman's demotion, the demotions of other workers with health problems, and the alleged insensitive treatment of Minard. The court concluded that no reasonable jury could find that UARCO perceived Schoolman as disabled, and discriminated against him on that basis, and therefore granted summary judgment to UARCO on that claim.

Finally, the district court rejected Schoolman's claim that UARCO discriminated against him on the basis of age in relation to his retirement plan. *Under EEOC v. Francis W. Parker School,* 41 F.3d 1073 (7th Cir.1994), *cert. denied,* 515 U.S. 1142, 115 S.Ct. 2577, 132 L.Ed.2d 828 (1995), the court found that Schoolman must show discriminatory intent on the part of UARCO. Because Schoolman was to receive the actuarial equivalent of a lump sum payment, the court found that no discriminatory intent could be inferred, and granted summary judgment to UARCO on this claim as well.

### D.

On appeal, both Huff and Schoolman argue that UARCO's treatment of union workers and Trillet's statements during union negotiations are relevant evidence of a company policy to discriminate on the basis of age. Plaintiffs also argue that the Industrial Relations Manual applies to all employees by its own terms, and not just to supervisory employees. Further, they contend that the Manual created a policy of seniority-based demotions only, and that a violation of UARCO's own policy was relevant to a showing of pretext. Both Schoolman and Huff argue that supervisors were interchangeable among the five departments, and that UARCO's failure to rank all the supervisors together (rather than just the finishing department supervisors) is more evidence of pretext. Further, plaintiffs point out that although UARCO claimed it was undergoing a reduction in force, the number of workers at the plant actually increased slightly during the relevant time period. Plaintiffs also cite the retention of Nasers in a supervisory position as evidence of pretext, because Rhodes rated Nasers fifth in the group of five, and below average.

Schoolman additionally appeals the grant of summary judgment to UARCO on his disability and pension plan discrimination claims. In support of the disability claim, Schoolman cites the demotions of several older workers with health problems, the physically demanding nature of the jobs to which they were demoted, and UARCO's insensitivity to the health problems of Minard. Schoolman argues that the express language of the benefit plan, refusing lump sum payouts to workers over fifty-five with ten years of service, shifts the burden of proof onto the employer to show the lawfulness of its action. Given that UARCO has admitted that there is no cost-based justification for its benefit plan discrimination, Schoolman argues it is not entitled to summary judgment.

## II.

We review the district courts' grants of summary judgment *de novo*. *Green v. Shalala*, 51 F.3d 96, 99 (7th Cir. 1995). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Robinson v. PPG Industries, Inc.*, 23 F.3d 1159, 1162 (7th Cir.1994). Plaintiffs can make out their claims of age discrimination directly or indirectly. Under the direct proof method, plaintiff must show either an acknowledgment of discriminatory intent by the defendant or its agents, or circumstantial evidence that provides the basis for an inference of intentional discrimination. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). We have outlined three types of circumstantial evidence of intentional discrimination: 1) suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other evidence from which an inference of discriminatory intent might be drawn; 2) evidence that employees similarly situated to the plaintiff other than in the characteristic on which the employer is forbidden to base a difference in treatment (i.e. age, race, sex, etc.) received systematically better treatment; or 3) evidence that plaintiff was qualified for the job in question but was passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief or, a mere pretext for discrimination. *Id.* The third type of circumstantial evidence in a direct case is substantially the same as the evidence required in a so-called indirect or *McDonnell Douglas* case, which we will analyze separately. Schoolman relies on indirect proof, and thus we consider only Huff's claim here. Huff has presented no evidence that UARCO acknowledged its discriminatory intent, and thus relies on circumstantial evidence. The only circumstantial evidence Huff presents is Trillet's statements in union negotiations and the treatment of older union workers during layoff and recall.

As we discuss below, this evidence is insufficient in a direct proof case, but in combination with other evidence, may suffice under the indirect proof method.

UARCO concedes, as discussed above, that both plaintiffs have made out a *prima facie* case under the indirect proof method. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. In response to the *prima facie* case, UARCO offers its age-neutral justification for the demotions, namely, that it wanted to reduce the number of supervisors in the finishing department to save money, and that it selected these two workers for demotion because they were the lowest ranked performers in the group. That age-neutral justification returns the burden to Schoolman and Huff to show that the stated reason is a pretext. *Id.*, 411 U.S. at 802–03, 93 S.Ct. at 1824–25.

In order to decide whether Schoolman and Huff can present enough evidence to go to trial on their claims, we must resolve a few legal issues, because the district court found some of the proffered evidence irrelevant as a matter of law. In particular, we must decide (1) whether the Industrial Relations Manual applies to demotions of non-supervisory personnel; (2) whether Trillet's statements in union negotiations are relevant evidence in an indirect proof case of age discrimination; (3) whether UARCO's treatment of union workers is relevant evidence in an indirect proof case; and (4) whether UARCO's policy of refusing lump sum pension payouts to workers over fifty-five with ten years of service violates the ADEA.

### A.

We will begin with the Industrial Relations Manual (the "Manual"), which UARCO argues does not apply to supervisory personnel. Plaintiffs, of course, argue that it does apply to supervisory personnel and that seniority-based procedures for layoff and recall set out in the Manual should have been applied to their demotions. The fact that UARCO demoted them on a competitive basis instead of a seniority basis, in violation of the company's own policy, is evidence of pre-

text, according to Schoolman and Huff. The Manual provides:

> The INDUSTRIAL RELATIONS MANUAL is prepared for the use of all personnel in supervisory positions and constitutes an essential working tool for your guidance. It states the policies of the Company with respect to employee relationships and explains the procedures to be followed in implementing these policies.
>
> The primary objectives of the Company's industrial relations program are:
>
> —to develop an organization of employees carefully selected, trained and placed to function and coordinate effectively.
>
> —to provide opportunity for advancement in the organization and, at the same time, provide fair compensation and reasonable security.
>
> —to enable each executive and supervisor to manage effectively all his employees.
>
> —to provide uniformity of employee relations practices in all units of the business..
>
> . . . .
>
> [I]t should be clearly understood by each supervisor that since he is the front line of contact between management and the employees, he has direct responsibility for properly representing the Company's policies and the practices to his employees. Each supervisor is, in effect, his own "Industrial Relations Manager."

Manual at 1. The district court focused on the third objective and the "front line" language to support UARCO's contention that the Manual was to be used *by* supervisors but did not apply *to* supervisors. The plaintiffs point out, and one of the district courts acknowledged, that even supervisors have supervisors, and thus the Manual should apply *to* supervisors. However, the district court noted, "the manual does not expressly state that it applies to employment decisions regarding supervisors, although, as noted above, it does expressly apply to interactions between supervisors and non-supervisory employees." *Schoolman v. UARCO, Inc.*, 1996 WL 388468, *7 n. 7 (N.D.Ill. July 8, 1996).

We think the district court stretched too far in holding that the Manual does not apply

to supervisors as a matter of law. The Manual, by its own terms, applies to "employees," and supervisors are certainly employees. In certain parts of the Manual, the context suggests that a particular policy or procedure applies only to union workers or non-union, non-supervisory workers. But other parts of . the Manual expressly apply to supervisors. See Manual at p. 21 (setting out leadership traits desired in applicants for supervisory positions); at p. 47 (detailing minimum scores required on personnel and intelligence tests for persons applying for supervisory positions); at p. 56 (setting a schedule of termination pay for exempt employees, a group that includes supervisors); at pp. 132–33 (describing training courses available to supervisory employees); at p. 169 (describing supervisor orientation program); at p. 170 (detailing advanced training course open to supervisors); at p. 172 (describing leadership course available to experienced supervisors); and at p. 308 (setting out the company's sexual harassment policy, which expressly applies to "any associate, manager, supervisor, or nonemployee."). Much of the Manual applies implicitly to supervisors by applying generally to "employees" or to "exempt employees," defined as those workers whose jobs are "specifically exempted from the requirements of the Fair Labor Standards Act published by the Wage and Hour Division of the U.S. Department of Labor." Manual at p. 5. There is certainly enough ambiguity in the express language of the Manual to create a triable issue on whether the terms of the Manual apply to line supervisors such as Schoolman and Huff.

Of course, even if the Manual does apply to supervisors, the more pertinent question is whether the Manual creates a seniority-based policy for demotions of supervisors. Schoolman and Huff contend that the provisions of the Manual entitled "Watseka Plant Layoff Procedure—Non-contract Units" create a seniority-based policy for demotions. The procedure provides:

> When it becomes necessary to reduce manpower due to a lack of work, the reduction will be effected by following the "Unit Layoff Procedure" in the Non-Contract Unit (Department) in which the reduction is required. . . . Employees having previ-

ous service in a Non–Contract Unit (Department) will be given the opportunity to bump back to that Unit and exercise seniority in securing a job at the same or lower grade based on their original seniority date in the Unit ... following the "Unit layoff procedure."

Manual at p. 67. The Manual then describes the layoff/bump rights procedure for temporary layoffs, indefinite layoffs and emergency layoffs. The procedure in each case amounts to an opportunity for employees with seniority to accept a demotion by bumping a less senior employee out of a lower end job instead of being laid off. Plaintiffs contend that a layoff with bump rights is equivalent to a demotion.

The district court reasoned that the section of the Manual cited by plaintiffs related to layoffs only, and nothing in the section expressly addressed demotions. Moreover, plaintiffs had not presented any evidence that UARCO ever used that section of the Manual to determine the criteria for demotions. The district court therefore refused to consider UARCO's purported violation of the seniority policy as evidence that UARCO's stated reasons for the demotions were pretextual. Again, we believe the district court stretched too far to reach this conclusion. As we noted at the outset, this portion of the Manual is titled "Watseka Plant Layoff Procedure—Non–Contract Units." The plaintiffs are non-contract (i.e. non-union) workers, and the procedure nominally applies to them. We note that UARCO did not claim to set out to demote workers, but rather set out to reduce the supervisor-level manpower in the finishing department. True, the section title focuses on layoff procedures, but the introduction of the section states that it is the policy to be utilized for a reduction in manpower, exactly the kind of reduction UARCO claimed to be making when it decided to eliminate two supervisors in the finishing department. A "layoff" procedure which allows workers in affected positions to opt to displace less senior workers in lower grade positions is effectively a demotion procedure. *See* Webster's Ninth New Collegiate Dictionary (defining "demote" to mean "to reduce to a lower grade or rank"). On summary judgment, when we are obliged to draw all reasonable inferences in favor of the nonmoving party, we find that the plain language of the Manual creates a triable issue on whether UARCO violated its own policy on reductions in force for supervisors.

We must address one final issue before we leave the subject of the Manual. Schoolman and Huff claim that UARCO conceded the applicability of the Manual during the summary judgment process. Local Rule 12(m) of the General Rules of the United States District Court for the Northern District of Illinois requires a party moving for summary judgment to file a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." Each statement is to be supported by references to affidavits, parts of the record, or other supporting materials. Local Rule 12(n) provides a corresponding requirement for the non-moving party to respond to each statement made by the moving party, noting any disagreement and referring to the record in support of any disagreement. Material facts set out by the moving party "will be deemed to be admitted unless controverted by the statement of the opposing party." Local Rule 12(n)(3)(b). The non-moving party is also to supply a statement of any additional facts that require denial of summary judgment, and correspondingly, any material facts set forth by the non-moving party will be deemed admitted unless controverted by the statement of the moving party. We have upheld strict compliance with Local Rule 12 on numerous occasions. *See e.g.*, *Bourne Co. v. Hunter Country Club*, Inc., 990 F.2d 934, 938 (7th Cir.1993), *cert. denied*, 510 U.S. 916, 114 S.Ct. 308, 126 L.Ed.2d 256 (1993) (where defendant denied the materiality of plaintiff's statement of facts, defendant failed to deny material facts, and they were properly deemed admitted); *Schulz v. Serfilco, Ltd.*, 965 F.2d 516, 519 (7th Cir.1992) (upholding district court's decision to deem admitted defendant's Rule 12 facts to which plaintiff failed to specifically respond, even where plaintiff generally disputed those facts throughout its briefs); *Maksym v. Loesch*, 937 F.2d 1237, 1240–41 (7th Cir.1991) (approving strict enforcement of Rule 12).

The parties hotly contested at oral argument and in their briefs whether UARCO conceded applicability of the Manual to supervisors, each side accusing the other of playing fast and loose with the facts. So we turn to the Rule 12 statements in question to determine what happened here. Plaintiffs each submitted Rule 12 statements in identically worded but differently numbered paragraphs relating to the applicability of the Manual. Plaintiffs alleged that the Manual provides for demotion of non-contract workers on the basis of seniority only, that plaintiffs were noncontract employees, and that the layoff/bump rights provisions clearly covers demotion. In response to plaintiffs Rule 12 statement, defendants first generally "concede[d] for summary judgment purposes that … [the relevant paragraphs] accurately reflect certain record testimony, but den[ied] they [were] material to Defendant's motion for summary judgment." The defendants in their "specific" objections again contested the materiality of plaintiffs' statements, denying that plaintiffs have presented any evidence that the Manual applies to management personnel. Defendants also cite to deposition testimony of Trillet and Rhodes, and even plaintiff Huff for the contention that seniority does not govern the demotions of supervisory personnel. First, as we have already determined, plaintiffs have created a genuine issue of material fact about the applicability of the Manual to supervisors, by citing the plain language of the Manual itself. Second, we know from *Bourne* that denying the materiality of a Rule 12 statement is not sufficient to deny a material fact and can, in fact, constitute a concession. 990 F.2d at 938. Third, defendants never specifically deny that the Manual applies to non-contract workers, that plaintiffs are non-contract workers and that the layoff provisions essentially govern demotions. In combination with defendants' general concession that plaintiffs have accurately represented the record, defendants can be said to have conceded these points, and it would have been within the district court's power to rule that UARCO conceded these points. In any case, defendants' equivocating response to plaintiffs' Rule 12 statement certainly does not entitle defendant to a resolution of this point in defendants' favor on summary judgment.[4]

### B.

We next address whether the statements made by Trillet during union negotiations may be used by Schoolman and Huff to show that UARCO's stated reason for the demotions is pretextual. The EEOC filed an *amicus curiae* brief in support of Schoolman on this point, arguing that in an indirect case, a decision maker's discriminatory remarks, although unrelated to the employment decision at issue, are probative of pretext, and may be used to support a *prima facie* case for a plaintiff using the indirect method of proof.[5] The parties point to two lines of cases addressing the use of discriminatory statements that are not related to the employment decision at issue, or so-called stray remarks. Plaintiffs cite to *Futrell v. J.I. Case*, 38 F.3d 342 (7th Cir.1994), *McNeil v. Economics Laboratory, Inc.*, 800 F.2d 111, 115–117 n. 5 (7th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987), *Shager v. Upjohn Co.*, 913 F.2d 398 (7th Cir.1990) and *Fuka v. Thomson Consumer Electronics*, 82 F.3d 1397 (7th Cir. 1996) in support of their argument that Trillet's remarks preclude summary judgment because they are evidence of discriminatory intent with regard to plaintiffs' demotions. UARCO also cites *Fuka*, (albeit for the opposite proposition) and also cites *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), *Rush v. McDonald's Corp.*, 966 F.2d 1104 (7th Cir.1992), *Monaco v. Fuddruckers Inc.*, 1 F.3d 658 (7th

---

4. This analysis applies to the numerous other disputes the parties have over other Rule 12 statements. Neither party strictly complied with the Rule. Plaintiffs failed to recognize some of UARCO's specific objections, but UARCO failed to specifically object to many of the statements, instead contesting their materiality. We have sorted out what can only be described as a mess as best we could.

5. Although the EEOC did not file an *amicus curiae* brief on behalf of Huff, he makes the same arguments about the proper use of Trillet's remarks. Therefore, our discussion on this point applies to both plaintiffs.

Cir.1993) and *McCarthy v. Kemper Life Ins. Companies,* 924 F.2d 683 (7th Cir.1991) for the proposition that the remarks must be made by the decision maker and must relate to the employment decision in question before they can be evidence of discriminatory discharge.

We turn first to the remarks themselves. Approximately six months before the plaintiffs' demotions, UARCO was engaged in negotiations with the union regarding procedures for layoffs. During the negotiations, which resulted in an agreement to base layoffs on seniority, Trillet and Stu Wilson (a UARCO hired bargaining consultant) made age-related comments that plaintiffs claim evidence a company policy to eliminate older workers. The comments, reflected in notes taken at the meetings, range from indications of age consciousness to concerns about losing younger workers in a seniority based system to concerns about training older workers who may retire soon thereafter. Plaintiffs attribute to Trillet, the decision maker in their demotions, a remark about the ages and seniority of "offset" workers, a comment contrasting workers who had seniority but were not trained to operate the Rotary P.S. label press with "junior men" who have the skill and training, and a comment that "we need to think about the future and some of these senior guys wouldn't be around that long even if we did train them." Notes of one meeting indicate that Trillet "can't lose rotary youngsters—real nightmare—last in first out." Wilson apparently asked "if a guy is 60 does it make sense to train him when he'll be retiring in two years." Wilson also chimed in when Trillet remarked on training more senior workers for the rotary press: "They are being laid off because there isn't enough work in Offset, where they work, and we don't want them to bump into Rotary presses, and be trained, because that is where our volume is growing." At another meeting, Wilson commented that "we had a problem with the single list concept, based on the additional training which would be required and the attendant loss of production when we put a young 'banger' on the street."

The district court in Schoolman found that these statements were ambiguous at best

with regard to age discrimination and called the notes reflecting the statements "cryptic." *Schoolman,* 1996 WL 388468, at *8. Citing *Fuka,* and *McCarthy,* the court held that the remarks must be related to the employment decision in question or they will not be considered as evidence of discriminatory discharge. *Schoolman,* 1996 WL 388468, at *8. The Huff court also noted that the statements were unrelated to the decision to demote the plaintiffs, were related instead to non-supervisory union workers, were made in part by people not involved in the decision to demote plaintiffs, and were difficult to interpret. *Huff v. UARCO, Inc.,* 925 F.Supp. 550, 556 (N.D.Ill.1996). The Huff court specifically found that the statements, read in context, do not show an intent to discriminate against older workers but instead reflect UARCO's desire to structure its seniority system in a cost effective manner. Further, the court found significant, in light of *Hazen Paper,* that the statements related to seniority and not age. Finally, the Huff court suggested it was too much of a stretch to relate remarks made during consideration of union workers' seniority rights to UARCO's intent when demoting the plaintiffs.

We must resolve, therefore, whether these statements are too ambiguous or cryptic to be useful as evidence of pretext, and whether statements made by a decision maker but unrelated to the employment decision in question may be used as evidence of pretext. On the issue of ambiguity, we have already held that the "task of disambiguating ambiguous utterances is for trial, not for summary judgment." *Shager,* 913 F.2d at 402. True, some of the statements refer to seniority as opposed to age, but there are enough references to age to bring the statements outside the reasoning of *Hazen Paper* on this issue. We think a jury could infer that the statements evidence an age-related bias on the part of Trillet and UARCO in relation to union workers.

■■■■ But whether the statements indicate an age-biased intent in UARCO's decision to demote Schoolman and Huff is another question. In a direct case, we think that such remarks are not probative of the employer's intent. *See Fuka,* 82 F.3d at 1403

(in a direct proof case, plaintiff must show that the remarks were related to the employment decision in question); *Monaco*, 1 F.3d at 660 (remarks must be related to the employment decision in question to overcome summary judgment in a direct case). As the EEOC pointed out in its *amicus* brief, in the few cases where we suggested that the discriminatory remarks must be related to the employment decision in question, the plaintiffs were proceeding under a *Price Waterhouse* theory, and the issue was whether the evidence was sufficiently compelling to shift the burden of proof to the employer. Here the issue is whether the evidence is probative of discriminatory bias, and whether it may then be considered, along with other evidence, to make a showing of pretext under a *McDonnell Douglas* theory. We find that such evidence is probative of discriminatory bias when assessing whether an employer's reasons for an adverse employment action are pretextual.

 However, even in an indirect proof case, remarks unrelated to the employment decision in question may not overcome summary judgment if they stand alone as evidence of the employer's discriminatory intent. *See Rush*, 966 F.2d at 1116 (inappropriate remarks, standing alone, need not give rise to an inference of discriminatory intent in establishing the *prima facie* case under the indirect method); *Monaco*, 1 F.3d at 662 (unrelated remarks alone are insufficient as a matter of law to support an inference of age discrimination). However, such statements, when considered in conjunction with other evidence, could support an inference of discriminatory intent under the indirect, burden-shifting method. *Fuka*, 82 F.3d at 1406. *See also Futrell*, 38 F.3d at 347 (although unrelated statements alone do not prove discriminatory discharge, they may suffice to present a *prima facie* case and may indeed persuade the fact finder that the plaintiff has carried his or her ultimate burden of persuasion.) Of course, the "reasonableness of such an

inference in any given case ... would depend on the nature of the alleged discriminatory remarks, their relationship to the employment decision in question, the nature of the stated reason for the employer's action, and the existence of other evidence calling that reason into doubt." *Fuka*, 82 F.3d at 1406. When a plaintiff uses the indirect method of proof, no one piece of evidence need support a finding of age discrimination, but rather the court must take the facts as a whole. *Futrell*, 38 F.3d at 350. *See also Ostrowski v. Atlantic Mutual Ins. Companies*, 968 F.2d 171, 182 (2d Cir.1992); *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 20 (7th Cir.1987).

Keeping these standards in mind, we think the district court erred when it held that statements must be related to the employment decision in question in order to be probative of UARCO's intent in this indirect proof case. First, the statements do not stand alone. As we have already discussed, the plaintiffs have alleged, and on summary judgment we must accept as true, that UARCO violated its own seniority-based reduction-in-force policy when it demoted Schoolman and Huff on a competitive basis. Many of these statements were uttered by Trillet, the decision-maker for the demotions. Other of the statements were made by Wilson, who had been hired by UARCO to represent its interests in the union negotiations.[6] To the extent these statements evidence a company policy to eliminate older workers, plaintiffs are entitled to argue that inference to a jury. To be sure, UARCO has expressed a perfectly innocent construction for these comments, namely that it was concerned about retraining costs because the workers with less seniority were the ones trained on the equipment that was most in demand. UARCO is entitled to make that argument to the jury, just as Schoolman and Huff are entitled to argue that UARCO's true intent was to reduce the age of its workforce, and that intent carried over into its decision to demote plaintiffs. We do not imply that plaintiffs have a

---

6. Plaintiffs must show a nexus, of course, between Wilson and UARCO in order to attribute Wilson's statements to UARCO. If Wilson was acting as UARCO's agent when he made these remarks, and if the remarks were within the

scope of the agency, the district court could properly attribute the statements to UARCO. Plaintiff could also show this nexus by demonstrating that UARCO adopted Wilson's statements.

strong case but rather only that they have enough of a case to go to a jury. *See Partington v. Broyhill Furniture Industries, Inc.*, 999 F.2d 269 (7th Cir.1993).

### C.

■ Another piece of evidence relied upon by Schoolman and Huff to show intent to discriminate on the basis of age is UARCO's treatment of the union workers who were laid off as a result of the agreed upon seniority policy. According to plaintiffs, between ten and twenty months after plaintiffs' demotions, UARCO began recalling laid off union workers, but failed to follow the agreed-upon seniority system, instead recalling younger workers out of order. Plaintiffs proffer this violation of the seniority policy as further evidence of UARCO's intent to engage in age discrimination. Plaintiffs rely on *Ayala v. Mayfair Molded Products Corp.*, 831 F.2d 1314 (7th Cir.1987) for the proposition that "deviations from an otherwise observed seniority system may, at least when combined with other circumstantial evidence, be relevant on the issue of whether the employer's decision was age-neutral or age-conscious." 831 F.2d at 1320 n. 7. Defendants are quick to point out that in *Ayala*, the deviations from the seniority system directly affected the plaintiff, but that in the instant case, the deviations occurred with a completely unrelated group of employees. The district court found that the deviations were further attenuated from Schoolman and Huff by the passage of time, and by the fact that layoffs and recalls were categorically different from demotions.

We disagree that layoffs and recalls are categorically different from demotions in this particular case, because here the stated goal of UARCO in each instance was to effect a reduction in force. Under the company policy articulated in UARCO's Manual, reductions in force were to be effected on a seniority basis by layoffs with bump rights, i.e. by demotions when possible. As for the passage of time between the demotions and the recalls, we think this goes to the weight of the evidence, but that a blanket exclusion of the evidence is inappropriate given the difficulties inherent in proving age discrimination

by circumstantial evidence. *See Riordan v. Kempiners*, 831 F.2d 690, 698–99 (7th Cir. 1987) ("Proximity in time to the alleged discrimination is a proper consideration in assessing probative value; but given the importance of circumstantial evidence in proving (and, equally, disproving) employment discrimination, a blanket exclusion of evidence of events that occurred before or after the discrimination is arbitrary."); *Mathewson v. National Automatic Tool Co.*, 807 F.2d 87, 91 (7th Cir.1986) (lapse of time between demotion and termination reduces weight of evidence but given difficulty of proving employment discrimination via circumstantial evidence, use of evidence regarding time-barred claim is appropriate to help prove timely claim based on subsequent discriminatory conduct).

■ Moreover, "evidence of the decisionmaker's discriminatory motive regarding one employment decision may be used as evidence of that decisionmaker's discriminatory motive in making a similar employment decision." *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1518–19 n. 9 (11th Cir.1990). As with the so-called stray remarks, UARCO's treatment of other workers in similar circumstances is probative of UARCO's intent with regard to Schoolman and Huff in an indirect proof case. Again, we do not think this piece of evidence alone is enough to overcome summary judgment, but in combination with plaintiffs' other evidence, it is enough to give plaintiffs their respective days in court.

### D.

We must also consider other evidence of pretext proffered by plaintiffs and rejected by the district court. Plaintiffs claim that supervisors were interchangeable among departments, and that UARCO's failure to rank all of the supervisors together casts suspicion on UARCO's claim that it was simply trying to retain the best supervisors. UARCO vociferously denied that supervisors were interchangeable among departments, until it finally conceded at oral argument that it did consider supervisors in the press and finishing departments interchangeable. In fact, UARCO swapped two

supervisors in these departments at the time of the demotions, transferring the lowest ranked finishing department supervisor to the press department, and transferring a press department supervisor, who had never been ranked, into the finishing department to take his place. Although press and finishing supervisors were treated as interchangeable, Trillet never sought rankings and comments on press department supervisors. In combination with plaintiffs' deposition and affidavit testimony about the interchangeability of supervisors, we think plaintiffs have raised a genuine issue about interchangeability, and consequently, in combination with other evidence, have raised a genuine issue about pretext.

### E.

We next consider Schoolman's claim of discrimination in relation to the pension plan. UARCO's pension plan provides that a plan participant who has completed ten years of service and attained the age of fifty-five is eligible for early retirement. The plan also provides that a person terminating employment before becoming eligible for early retirement may elect a lump sum refund of all of that person's contributions under the plan, with interest. But a person terminating employment after becoming eligible for early retirement is entitled only to a payout of benefits over time, actuarially adjusted to take into account the extra years of receiving the benefit. See UARCO Retirement Plan at §§ 5.3 and 5.4. Schoolman argues, and the EEOC agrees, that denial of the lump sum payout to certain workers over fifty-five is direct evidence of discrimination. UARCO cites *Hazen Paper* in support of its contention that it is entitled to differentiate between workers with more than ten years of service and those with fewer than ten years, essentially denying that it engages in age-based distinctions.

The ADEA provides generally that age-based distinctions in benefits are unlawful unless, as part of a bona fide employee benefits package, the distinction is justified by an age-related cost consideration. *See* 29 U.S.C § 623(f)(2)(B)(i). Here UARCO has admitted that there is no age-related cost to the

lump sum payout as opposed to the payout over time. In fact, UARCO seems to be under the impression that it helps UARCO's case that the lump sum payouts are actuarially equivalent to the payouts over time. But actuarial equivalence is not the end of the inquiry. The point is that the benefit is different and in a certain way lesser. There may be a number of reasons why an employee would rather receive a lump sum payout than an actuarial equivalent over time. As a practical matter, as the EEOC pointed out, a benefit paid out over time does not have the same real-world value as a benefit paid on demand, in a lump sum.

Nor is it determinative under *Hazen Paper* that certain workers over the age of fifty-five, but who have fewer than ten years of service with the company, are eligible to receive a lump sum payout. In *Hazen Paper*, the benefit at issue was a pension that vested when the employee had given ten years of service to the company, regardless of the employee's age. The company had terminated an older employee who had more than nine years of service and was therefore close to vesting. The Supreme Court acknowledged that there was a correlation between years of service and age but held that that correlation was not enough to necessarily characterize the termination decision as one based on age:

> On average, an older employee has had more years in the work force than a younger employee, and thus may have accumulated more years of service with a particular employer. Yet an employee's age is analytically distinct from his years of service. An employee who is younger than 40 … may have worked for a particular employer his entire career, while an older worker may have been newly hired. Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily "age based."

*Hazen Paper*, 507 U.S. at 611, 113 S.Ct. at 1707. Characterizing the case as one of disparate impact instead of disparate treatment, and having drawn the analytical distinction

between age and years of service, the Court expressly declined to consider "the special case where an employee is about to vest in pension benefits as a result of his age, rather than years of service." *Id.*, 507 U.S. at 613, 113 S.Ct. at 1707 (emphasis in original).

Of course, the case we have here provides a hybrid of age and years of service. That is, in order to lose eligibility for a lump sum payout, a UARCO employee must have ten years of service and have attained the age of fifty-five. Because age is an express condition of receiving a benefit, we think that the instant case presents a close approximation of the case *Hazen Paper* declined to decide. *See EEOC v. Borden's, Inc.*, 724 F.2d 1390 (9th Cir.1984) (severance package which gave extra benefit to workers not eligible for retirement violated the ADEA where eligibility for retirement came at age fifty-five and after ten years of service). Nothing in *Hazen Paper* prohibits a finding that UARCO's expressly age-related policy violates the ADEA. Under the policy, no worker under fifty-five would ever be denied a lump sum payout, regardless of that worker's years of service. But for the age-related restriction, certain workers over fifty-five would be eligible for the lump sum payout. This is not a case where there is merely a correlation between age and the denial of a particular benefit. UARCO's policy draws an express line between workers over fifty-five and those under. In other words, this is not a case of disparate impact (*see EEOC v. Francis W. Parker School*, 41 F.3d 1073 (7th Cir.1994) (hiring system that disproportionately impacts older workers does not necessarily violate the ADEA)), but rather of disparate treatment. UARCO is not, therefore, entitled to summary judgment on this claim. Although this appears to be a purely legal issue—the parties. do not dispute the wording or meaning of the policy—Schoolman made no cross motion for summary judgment and we therefore remand this claim for proceedings consistent with our opinion.

### F.

The final issue is Schoolman's claim for disability discrimination, on which the district court granted summary judgment in favor of UARCO. Schoolman has conceded that he is not disabled as that term is defined by the ADA, but rather claims that UARCO demoted him at least in part because it perceived him to be disabled. Schoolman's evidence in support of this claim is that UARCO knew he had injured his back and temporarily required the use of an electric cart to get around the plant. Also, UARCO demoted other workers who had health problems, including Huff who had suffered a stroke, and another worker who had suffered a heart attack. Finally, Schoolman claims that UARCO was insensitive to the needs of Minard who had also injured her back. Under the ADA, an individual is "disabled" if he or she (1) has a physical or mental impairment which substantially limits one or more major life activities; (2) has a record of such impairment; or (3) is regarded as having such an impairment. 29 U.S.C. § 706(8)(B); *Stewart v. County of Brown*, 86 F.3d 107, 111 (7th Cir.1996). The phrase "major life activities" refers to "functions, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(h)(2)(i); *Stewart*, 86 F.3d at 111. Even if we assume all of Schoolman's allegations are true, and UARCO of course disputes that they are, Schoolman offers nothing to show that UARCO regarded him as having a physical impairment that substantially limited a major life activity. At best, Schoolman offers evidence that shows UARCO knew that Schoolman suffered a temporary condition that minimally impaired his ability to walk. All of the evidence shows that UARCO accommodated this temporary condition with the electric cart. Without more, the district court properly granted summary judgment on this claim.

### III.

We emphasize again that although plaintiffs may have a weak case, we believe they have enough of a case on their age discrimination claims to take the claims to a jury. Employers who engage in discriminatory conduct rarely expressly reveal their discriminatory intent, and these cases are especially difficult to prove. That is why we apply the

summary judgment standard with added rigor in cases like these. *See Robinson,* 23 F.3d at 1162. Therefore, in summary, we reverse and remand for trial plaintiffs' claims of age discrimination in employment, reverse and remand Schoolman's claim for age discrimination in the provision of his pension benefits, and affirm the district court's grant of summary judgment on Schoolman's disability discrimination claim. Schoolman and Huff are to recover their costs in these appeals.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.