**Jerry WILEY, Plaintiff–Appellant,**

v.

**State of ILLINOIS, Illinois Department of Veterans' Affairs, and John Johnston, individually and in his official capacity, Defendants–Appellees.**

No. 03–1306.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 2004.

Decided Jan. 23, 2004.

Charles S. Watson, Springfield, IL, for Plaintiff–Appellant.

John A. Kauerauf, Sorling, Northrup, Hanna, Cullen & Cochran, Springfield, IL, for Defendants–Appellees.

Before FLAUM, Chief Judge, MANION and EVANS, Circuit Judges.

### ORDER

Jerry Wiley brought this action under Title VII, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act, 42 U.S.C. §§ 1981 and 1983. He alleges that his termination from his job with the Illinois Department of Veterans' Affairs was racially motivated and that he was retaliated against for opposing racial discrimination within the department. The district court granted summary judgment for the defendants and Wiley appeals.

The Department of Veterans' Affairs, a department of Illinois state government, was created pursuant to the Civil Administrative Code of Illinois, 20 ILCS 5/5–15. Its principal objectives are to assist Illinois veterans, their dependents, and survivors in applying for federal, state, and local entitlements and services and to administer awards and grants.

The department is empowered by the administrative code to employ the personnel necessary to achieve its objectives. The tenure of employees is defined in the Illinois Personnel Code, 20 ILCS 415 *et seq.* Non-exempt principal managing administrators of the department can be employed under a "term appointment" of 4 years. Term appointments are renewable, but the failure to renew a term appointment is neither "grievable or appealable." 20 ILCS 415/8b.19. Wiley, who began his employment in the department in June 1990, received his first term appointment on December 16, 1991. His appointment was renewed for another 4 years in December 1995. It was when his term came up for renewal again in December 1999 that he was let go. At that time, a new governor of Illinois had been elected, and he in turn had appointed a new director of the department—John Johnston. It was Johnston who decided not to renew Wiley's appointment. As the regulations show, Wiley's nonrenewal itself does not give rise to a cause of action. Rather, what Wiley contends is that his nonrenewal was actually based on his race—he is African–American—and was in retaliation for his objecting to racial discrimination in the department.

Soon after taking office, Director Johnston changed the chain of command and told Wiley that he would be reporting di-

rectly to him. During the period: from February 1999 until the nonrenewal in December 1999, several unpleasant events occurred which, according to Director Johnston, led to Wiley's nonrenewal. Wiley, on the other hand, contends that these events were a smokescreen and that his nonrenewal was racially motivated. The district court decided the case on summary judgment, a decision we review *de novo*. *Rogers v. City of Chicago*, 320 F.3d 748 (7th Cir.2003).

As Wiley points out, he may prove his case by either the direct method of proof or the indirect method. *Venturelli v. ARC Community Servs., Inc.*, 350 F.3d 592 (7th Cir.2003). As *Venturelli* has recently again summarized, under the direct method a plaintiff may present either direct or circumstantial evidence. Direct evidence, which is almost never available, would be, for instance, an admission by a decision-maker that his actions were based on prohibited factors. Circumstantial evidence is that which would allow a jury to infer discrimination or retaliation. It can include suspicious timing, ambiguous statements, and behavior toward employees in the protected group. It can also include evidence that the employer systematically treated other similarly situated employees better than those in the protected group, or evidence that, in a promotion decision, a plaintiff was passed over by someone not in the protected group, and that the employer's reason for the hiring decision is unworthy of belief. The evidence of pretext is substantially the same as that required under the indirect method of proof. *Huff v. UARCO, Inc.* 122 F.3d 374 (7th Cir.1997). The indirect method of proof is the familiar formula set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff must establish a prima facie case of discrimination or retaliation; then the defendant must come forward with a noninvidious reason for the decision, and, if

that is done, the plaintiff must present competent evidence that the proffered nondiscriminatory reason is pretextual.

Wiley contends that he succeeds under either method; the defendants disagree, saying that he has not succeeded under the direct method of proof and that, under the indirect method, he has not shown either a prima facie case or that the proffered reasons for the nonrenewal were pretextual. Our *de novo* review of the case convinces us that Wiley stumbles on the issue of pretext, no matter which method of proof he attempts.

Director Johnston contends he decided not to renew Wiley's employment for a number of reasons, which we will allude to here and some of which we will discuss more thoroughly below. He said Wiley was hostile toward management as was evidenced by memoranda and letters. Johnston said Wiley was insensitive to the needs of veterans residing in the department's skilled nursing home facility and faulted Wiley's role in the oversight of a program grant. Johnston also pointed to Wiley's failure to follow the directions of members of management during the budget preparation process. Finally, Johnston said Wiley was not present at work on time and that he took extended lunch breaks.

Wiley says the reasons are pretextual. He points out that he received an acceptable employee evaluation from Johnston and that at the time of the nonrenewal decision Johnston did not provide a rationale for his decision until after Wiley filed a charge of discrimination with the Equal Employment Opportunity Commission, nor did Johnston have a contemporaneously documented file to support his decision. These arguments, however, ignore the fact that under the Illinois Administrative Code, Wiley's employment could be terminated without recourse at the end of his term. Prior to being accused of discrimi-

nation, Director Johnston had no reason to articulate reasons for the nonrenewal. In some ironic sense, if Johnston had compiled a file on Wiley prior to the nonrenewal of his employment, it might seem more likely that discrimination was afoot. One might then conclude that Johnston was not simply making a decision not to renew the term of a high-level term employee, but that he was documenting nondiscriminatory reasons to get rid of an African–American employee. In other words, he could be seen as aware that this nonrenewal was exceptional, not routine.

Wiley also points to the timing of the decision, coming as it did after he had objected to the treatment of another African–American in the department. However, the timing is dictated by the expiration of the term of Wiley's employment. That being the case, it is hard to draw any conclusions from the timing.

More importantly, given the letters and memoranda in the record, it is not hard to see why Johnston would decide not to renew Wiley's contract. And the same documents negate a showing of pretext.

On April 20, 1999, Wiley wrote an intemperate memorandum to the department information system manager, Jim Johnson, in which he said that Johnson had "misrepresented the facts and our agreement" regarding purchases of two PCs. He says, "It is obvious that you have forgotten this discussion, so I will attribute it to your memory rather than believing that you purposely misrepresented the facts." Director Johnston received a copy of the memo. On June 3, 1999, Wiley wrote a memorandum in response to one sent out by the department internal auditor, Don Bullerman. Wiley's memo was entitled "You Really Have Lost Your Mind." In it, Wiley says things such as, "I have put off responding to your memos until I had a chance to cool off. So I will try to the best of my ability to respond in a professional manner to your ridiculous memos." Later he says, "You are out of your mind if you think for one minute that either of these African–Americans are going to be penalized for participating in those meetings." Or "Stop showing your ignorance and wasting the Director's time on non-issues." Or "[I]f you are just blowing smoke, we don't have time for that, please find you some business." And to show what he really thinks, "Now this is the stupidest thing I have ever heard." This, we remember, is what Wiley wrote *after* he cooled off.

In another memo he said, "If in your capacity as Internal Auditor you discover wrongdoing — say it, if not shut-up and stop lying." He concludes:

> If Director Johnston gives me a mission I will work just as hard to get it done as well. If you don't like it, hey tuff. I don't guess that I have to tell you that all of the roles I have played were in addition to the role of Fiscal Officer. Somethings I request reimbursement for—some I don't. What have, or are you doing?

Director Johnston, who had received copies of these memos, told both Wiley and Bullerman that the letter writing should stop. Nevertheless, on August 25, Wiley prepared another memorandum, this one addressed to Director Johnston, complaining about Bullerman. The memo was entitled "pit bull" and Wiley suggested that Bullerman's "chain should be shortened."

In addition to the memos, Director Johnston had another experience involving Wiley. Johnston visited the Illinois Veterans Home at Quincy, a skilled nursing home. While he was there, he was shown old and unserviceable commercial washing machines. Johnston went to the Illinois Bureau of the Budget and obtained funding to buy new washers. But Johnston was later informed that Wiley stopped the purchase of the washers. Instead, Wiley

was reported to have said that the residents should be encouraged to wear sweat suits to reduce the amount of their personal laundry.

In making a decision on whether to renew the employment of a high-level term employee, Director Johnston could easily reason that Wiley was causing more trouble than he was worth. There is nothing in the record which shows that his reasoning was pretextual.

Wiley attempts to discredit Johnston's basis for the decision by saying that Johnston changed his story. In his deposition, he was asked to name three managers who had developed an adversarial relationship with Wiley. He named employees Foster, Menaugh, and Fritz. Later, he submitted an errata sheet also naming Johnson, Bullerman, and Cramer. Wiley says this shows that Johnston was changing his rationale for the nonrenewal. Johnston says that, to the contrary, he realized when he reviewed the transcript that the deposition question referred specifically to the department's EEOC pleading, which said that Wiley had developed an adversarial relationship with "at least three" members of the management team and then proceeded to discuss memoranda and e-mails with Johnson, Bullerman, and Cramer. The addition of three persons to the list of people Wiley had trouble with does not show that Johnston's rationale was pretextual. Johnston could have believed—and apparently did believe-that Wiley had trouble with all six.

Under either method of proof, Wiley fails to show that Director Johnston's reasons for not renewing his contract were pretextual. Accordingly, the judgment of the district court dismissing the complaint is AFFIRMED.