**JOAN H. KASTEL, Plaintiff,**

v.

**THE WINNETKA BOARD OF EDUCATION, DISTRICT 36, d/b/a The Winnetka Public Schools, Rebecca van der Bogert, Superintendent of the Winnetka Public Schools, and Edward Ogata, M.D., President of District 36, Winnetka Board of Education, Defendants.**

No. 96 C 1008.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 28, 1997.

Mark D. DeBofsky, Richard Quentin Holloway, DeBofsky & DeBofsky, Chicago, IL, for plaintiff.

Paulette A. Petretti, Philip H. Gerner, III, Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., Chicago, IL, defendant.

## *MEMORANDUM OPINION AND ORDER*

CASTILLO, District Jugde.

This action involves a variety of claims all based on the defendants' failure to re-hire plaintiff Joan Kastel after her retirement in 1995. At this point in the litigation, four of the plaintiff's claims remain. Count I is an age discrimination claim brought under the ADEA, 29 U.S.C. § 621 *et seq.* Count II alleges that the defendants retaliated against Kastel because of her objections to their discriminatory treatment of her. Count VI is a breach of contract claim, and Count IX is a claim under the Illinois constitution's equal protection clause based on retaliation for the exercise of pension rights. The defendants have moved for summary judgment on all claims.

### RELEVANT FACTS [1]

Joan Kastel began working for the Winnetka school system in 1964, when she was thirty years old. She has a bachelor's degree and is certified in speech and language pathology. From all accounts, Kastel loved her work and was very good at it. Evaluations and letters indicate that Kastel was outstanding in her work with children and their parents. During the 1993–94 school year, Kastel was working as a full-time speech-language pathologist in the Greeley School, one of four elementary schools in the

---

1. The following recital of the facts is drawn from the factual statements and exhibits submitted by the parties pursuant to Local General Rule 12. Unless otherwise noted, the facts are undisputed.

As an aside, we agree with the plaintiff that the defendants' factual statements fail to comply with the intent of Rule 12 that submitted statements be concise and relevant to the legal issues raised in the summary judgment motion. The inclusion of a multitude of factual assertions within a single numbered paragraph greatly reduces the clarity and usefulness of that paragraph. The defendants' submissions were also extremely repetitive, and focused at great length upon issues related only distantly (if at all) to the legal arguments developed in the motion. We urge the defendants to avoid such submissions in the future.

Winnetka public school system. The principal in that school was Sandy Karaganis.

In 1993, the Illinois legislature enacted an early retirement incentive program for public school teachers and administrators, known as the "5+5" program—its provisions involved, among other things, extra pension credits accumulated over a five year period. Teachers and administrators over the age of 50 with certain minimum levels of service were permitted to take advantage of the 5+5 program during the 1993–94 and 1994–95 school years. Although other early retirement incentive programs were in effect before and after this period, the 5+5 program provided higher-than-usual incentives to retire.

Joan Kastel met the eligibility requirements for the "5+5" program and, during the 1993–94 school year, became interested in retiring if she could continue to work in some capacity thereafter. When she mentioned her interest to her principal, Sandy Karaganis, Karaganis urged her to stay at the school at least through 1993–94. Kastel also spoke with the superintendent of the Winnetka school system at that time, Don Monroe, about continuing to teach after retiring under the 5+5 program. Monroe was experiencing some difficulty in accommodating the wishes of all of the teachers who wished to retire, because a large number of those interested in the 5+5 program wanted to continue working as long as possible before retiring, deferring the 5+5 acceptance until 1994–95. Monroe was one person short of reaching the number of people retiring during 1993–94 that would permit the deferral of the remaining retirements. In order to reach the necessary number of 1993–94 retirements, Monroe offered Nina Goldstein, a foreign languages teacher, a guarantee of five years of post-retirement part-time work if she would retire during the 1993–94 year. Goldstein accepted this offer. When Kastel spoke to Monroe about her own options, Monroe offered the same deal to Kastel. Kastel indicated to Monroe that she thought that she would be able to work part-time after retirement even without accepting Monroe's deal, and that she preferred to retire at the end of the 1994–95 school year. Monroe did not offer Kastel future part-time employ-ment if she were to retire in 1994–95, but neither did he disabuse her of the notion that she might be able to gain such employment through her own efforts. Monroe himself took advantage of the 5+5 program and retired at the end of the 1993–94 school year.

Kastel continued working full-time at the Greeley School during the 1994–95 school year. Early in 1995, she and her principal, Karaganis, began discussing ways that Kastel could work part-time after her retirement under the 5+5 program. Karaganis knew a speech-language pathologist named Ghita Lapidus whom she was eager to bring to Greeley, and she asked Kastel to meet with Lapidus to explore the possibility of sharing the position beginning the next fall. Kastel did meet with Lapidus, and early indications were that Kastel would indeed be able to work part-time after retiring, sharing her old position with Lapidus. In February 1995, Karaganis issued a school bulletin that noted, among other items, that teachers who chose to retire would be able to work up to 100 days or 500 hours annually in their current positions after retirement. Although the source of Karaganis' information is not clear, state law indeed permitted retirees to work part-time after their retirement under certain restrictions. *See* 40 ILCS 5/16–118.

On February 16, 1995, Kastel wrote the new school superintendent, Becky van der Bogert, regarding her plans to retire and then return to work part-time. Kastel indicated that she planned to take 5+5 retirement at the end of the year, but that she would reconsider that decision if she could not work part-time thereafter. Van der Bogert, who was aware of four other teachers who wanted to pursue the same plan, told the principals of the five teachers that school board approval of their plans could not be assumed. At the same time, van der Bogert asked the school district's Business Manager, Shelley Clark, to prepare information on the five teachers' current salaries, the amounts that the district would have to pay into their retirement accounts when they selected the 5+5 program, their salaries if re-hired part-time, and the amount of money the district would save by hiring less experienced teachers instead.

Van der Bogert presented this data, along with the five teachers' requests to continue working after retirement, to the school board in an executive session held in April 1995. The board discussed the matter among themselves and arrived at a consensus that none of the five teachers would be re-hired after their retirement.[2] No resolution on the subject was passed, and as no notes were kept of the executive sessions of the board, there is no written documentation of this decision. Board members, including then-President Ogata and then-Vice President (now President) Steve Adams, have testified that the board's decision was based on fiscal concerns, educational concerns (a stated preference for full-time employees, and an assumption that "continuity" could not be achieved if retirees were hired), and concerns for equity, i.e., treating all retirees alike. Immediately after the April 1995 meeting, van der Bogert advised the five teachers of the board's decision not to re-hire them.

On May 31, 1995, van der Bogert received a letter from Kastel about her continuing desire to continue working after retiring. The letter stated that Kastel believed that "a commitment was made to employ [her] half time at Greeley for the 1995–96 school year," that she had accepted that offer, and had acted in reliance on it "in making plans for next year." Kastel also expressed her desire to submit an application for employment. Kastel had had a telephone conversation with van der Bogert the day before, in which Kastel had expressed her reluctance to stop working. Van der Bogert told her that she could continue working either full-time or part-time, but only if she did not retire under the 5+5 program. Kastel rejected this option and asked how to apply for post-retirement openings. Van der Bogert told her that there was no application form for speech-language pathologist positions, but that she could simply send in a cover letter and a resume. The May 31st letter, which was accompanied by a resume, was intended to serve as an application for part-time employment during the 1995–96 year. On June 20, 1995, van der Bogert wrote to Kastel,

rejecting her application on the ground that there were no openings available. This was admittedly a "technicality," as van der Bogert had been told by Kastel that she would retire, thereby creating an opening, if she were permitted to continue working part-time afterwards.

On June 21, 1995, Kastel wrote to the school board, requesting that the board reconsider its decision not to re-hire 5+5 retirees, at least as to her case, and asking for a meeting with the board. Ogata and Adams instead offered Kastel the opportunity to meet with them alone, which Kastel did in July 1995. After the meeting, Ogata and Adams recorded their impressions of the meeting, which included Kastel's parting statements indicating disappointment that the meeting had not led to a reconsideration of the merits of her proposal, and threatening that if her requests continued to fall on deaf ears she would "take this to the next level" with her attorney. Ogata and Adams told Kastel that they would bring her concerns before the entire board at the next meeting; it is not clear whether this occurred. On August 1, 1995, the last possible date on which Kastel could still elect retirement under the 5 + 5 program, she did so, tendering her resignation. She was 60 years old.

During the 1995–96 school year, several part-time openings for speech-language pathologists occurred. Kastel did not re-apply for any of these, but her May 31 application was on file as to all of them. It is undisputed that she was not considered for any of these positions. In February, 1996, Kastel filed this suit. The defendants seek summary judgment on all remaining claims.

### LEGAL STANDARDS

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. Civ. P. 56(c). In determining whether a genuine issue exists, the court

---

2. There is some dispute over whether the school board actually adopted this policy the year before, during the 1993–94 school year, or not.

There is no dispute that the board had adopted the policy by April 1995 at the latest.

"must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The nonmovant must "make a showing sufficient to establish the existence of [the] element[s] essential to that party's case, and on which that party will bear the burden of proof at trial" in order to withstand a motion for summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

When determining whether factual issues exist, the court must view all evidence in the light most favorable to the nonmoving party, and draw all inferences in the nonmovant's favor. *Wolf v. Buss,* 77 F.3d 914, 918 (7th Cir.1996); *Taylor v. Canteen Corp.,* 69 F.3d 773, 779 (7th Cir.1995). However, if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party there is no 'genuine' issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations and the weighing of evidence are jury functions, not those of a judge when deciding a motion for summary judgment. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

■ In an employment discrimination case, "summary judgment is improper if the plaintiff offers evidence from which an inference of ... discrimination may be drawn." *Fuka v. Thomson Consumer Elecs.,* 82 F.3d 1397, 1402–03 (7th Cir.1996) (citations omitted). In such a case, where credibility and intent are pivotal issues, the above standards apply with added rigor. *Schmidt v. Methodist Hosp. of Indiana, Inc.,* 89 F.3d 342, 344 (7th Cir.1996).

## ANALYSIS

*Count I—Age Discrimination Claim*

■ To prevail on a claim for age discrimination, Kastel must prove that she was subjected to adverse employment treatment, and that "age was a determin-

ing factor in the sense that [the employment decision would not have been made] but for the employer's motive to discriminate on the basis of age." *Oxman v. WLS–TV,* 846 F.2d 448, 452 (7th Cir.1988). The Seventh Circuit has held that plaintiffs may prove this by presenting either direct or circumstantial evidence of discrimination. *Id.* The most common method of proving employment discrimination circumstantially is the burden-shifting method of proof articulated by the Supreme Court for Title VII claims in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and adapted to ADEA claims in *Tice v. Lampert Yards, Inc.,* 761 F.2d 1210, 1212 (7th Cir.1985). This method requires Kastel to make a prima facie case, creating a presumption that the decision affecting her employment was motivated by her age. The defendants may attempt to rebut this inference of discrimination by offering a non-discriminatory justification for the decision not to re-hire Kastel. Kastel then has the opportunity to demonstrate that this proffered non-discriminatory justification was merely a pretext for discriminatory action.

In this case, the defendants do not dispute the existence of Kastel's prima facie case. Rather, both parties proceed immediately to the issue of whether the defendants have offered a legitimate, non-discriminatory reason for their refusal to re-hire Kastel. The defendants argue that the evidence demonstrates that their decision not to re-hire any 5+5 retirees, and their refusal to make an exception for Kastel, were based on fiscal, educational and equitable concerns. Kastel charges that all of these purported concerns are merely a pretext for a discriminatory decision not to re-hire older teachers.

■ To defeat a motion for summary judgment, a plaintiff must "produce evidence from which a rational fact-finder could infer that [the employer's] proffered reasons were pretextual." *Senner v. Northcentral Technical College,* 113 F.3d 750, 755 (7th Cir.1997). In determining whether a stated reason is pretextual, the court looks not to whether the reason given is intelligent or sound, but only whether it is genuine: in other words, the

law does not prohibit stupid or unwise reasons for employers' actions, only discriminatory reasons or lies. *See Sample v. Aldi Inc.*, 61 F.3d 544, 549 (7th Cir.1995). "A plaintiff can prove pretext either by presenting direct evidence that a discriminatory reason motivated the employer's decision or by presenting evidence that the employer's proffered reason is unworthy of credence, thus raising the inference that the real reason is discriminatory." *Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997).

■ Kastel presents several pieces of evidence in her effort to discredit the defendants' contention that they refused to re-hire her based on fiscal, educational, and equitable concerns. First, she notes that both Ogata and van der Bogert have described the 5+5 program has having the purpose of replacing more senior teachers with younger, less experienced teachers.[3] The fact that these two school district officials directly referred to youth on these two occasions demonstrates, Kastel argues, that age was at least one motivating factor behind the school board's decision not to re-hire retirees, including her. While these statements may be open to different interpretations, "the 'task of disambiguating ambiguous utterances is for trial, not for summary judgment.'" *Huff v. UARCO Inc.*, 122 F.3d 374, 384 (7th Cir. 1997) (quoting *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir.1990)).

■ Second, Kastel argues that one of the reasons cited by the defendants for their decision not to re-hire retirees—continuity— is in fact discriminatory, because it relies on stereotypes about older workers being likely to work only a short time. In their briefs and affidavits, the defendants state: "In place of retiring teachers the Board planned to hire less experienced, full-time teachers who would grow with the District providing ongoing continuity to the school system. The Board did not believe the District would be served either fiscally or educationally by hiring many part-time people for relatively short-term positions." Mem. in Supp. of Mot. for Summ. J. at 6; *see also* Monroe aff. ¶ 10. Kastel protests that this view that older employees are necessarily "short-term" workers is nothing more than the perpetuation of a stereotype, comparable to the outdated perception that women are not desirable employees because they inevitably leave employment to get married or have children. We agree that this statement appears to be based on inaccurate and stigmatizing stereotypes that are the antithesis of the legitimate, non-discriminatory reason that an employer must produce under the *McDonnell Douglas* approach.[4]

■ Kastel also contends that the district's purported need for full-time, as opposed to part-time, teachers is not true for her area of specialization, speech-language pathology. Although she herself taught full-time for many years, full-time speech-language pathologists were the exception rather than the rule. The defendants' stated position on full-time work is also contradicted by van der Bogert's offer to Kastel that the district would employ her part-time in the future, so long as she did not take 5+5 retirement. Moreover, since Kastel retired, her position has been filled with a succession of younger, part-time teachers, and the dis-

---

3. To be more exact, Ogata testified, in answer to a question about whether the school district anticipated savings as a result of the 5+5 program:

Well, I believe as in any early retirement program, and, as you know, that certainly was the way of the world for a while, the perceived savings were that of reducing salary costs to senior people, no matter what industry, and then in theory, or perhaps in practice, these people would be replaced by younger, less experienced people who would command less compensation.

Ogata dep. at 18. Superintendent van der Bogert testified that her understanding of the spirit and intent of the 5+5 program was

to acknowledge the number of years in service that people had given to the district and to give them an added bonus so that their annuity would be greater the rest of their lives, and for the district, then, to hire people, younger people such that the—those going out get the bonus and the district also saves money.

van der Bogert dep. at 32.

4. To the extent that the defendants' stated educational concerns encompassed anything other than the "continuity" rationale they have advanced, Kastel points to her excellent teaching record as proof that such concerns are not applicable to her.

trict as a whole has hired only one full-time speech-language pathologist who splits her time between three schools.

As for the school board's stated concern for treating alike all retirees who wished to return, Kastel points out that, in fact, several retirees have been re-employed by the district, albeit not in formal teaching positions. For instance, Beverly Donnenberg was re-hired to do tutoring; Marcia Hochberg runs the French Club for a small annual stipend. These two teachers, who were among the five teachers who had sought re-employment following their 1994–95 retirement, were listed on the books as consultants. Maryann Jiganti and Karen Zajac, both of whom retired at the end of the 1993–94 school year, were re-employed to perform various services for the district at $4,000 annually. The defendants argue that they did not offer Kastel any of these positions because they understood that Kastel was only interested in a part-time teaching position; Kastel rejoins that she never said she would only accept a part-time teaching position, and that she would have considered any type of position but the defendants never offered her any. Regardless of the outcome of this dispute, it is undisputed that the defendants' decision not to re-hire 5 + 5 retirees did not preclude all re-employment, and likewise undisputed that Kastel was not considered for any openings of any kind after she retired.

■ Kastel's final argument on pretext attacks the heart of the defendants' proffered reasons: that they refused to re-hire 5 + 5 retirees because it would be too expensive. Kastel contends that she would be no more expensive than any other employee, because once she retired she would no longer be a tenured employee entitled to her highest salary grade, but instead would command only the standard entry-level salary. Indeed, she claims, she would actually be *less* expensive than other potential candidates, because the speech-language pathologist position now requires a master's degree, which establishes a higher starting salary, while she is eligible only for the bachelor's degree-level salary despite being formally qualified for speech-language pathologist positions. As for the fact that the district would also have to pay

the equivalent of her last, $61,675 salary into her pension account over five years under the 5 + 5 program, Kastel points out that the district would have to pay the same amount in any case, regardless of whether they re-employed her in a new position after retirement. The proper comparison is thus between her starting salary and that of any other candidate, without taking her pension payments into account.

On this one point—whether the district's stated fiscal concerns were a pretext for age discrimination—we cannot conclude that the plaintiff has shown pretext. As noted above, in assessing pretext we look only to whether the reasons offered by the employer are genuine, not whether they are objectively correct or wise. The defendants have submitted an affidavit from the school district's Business Manager, Shelley Clark, stating that the district believed it would have to re-hire Kastel for any post-retirement part-time teaching position at a salary based on a pro rata portion of her last salary. Thus, Kastel's salary for a half-time position would have been $30,388, far more than the comparable starting salary for someone new to the school system. Clark aff. ¶ 6. Other school board officials have also testified that they understood that the part-time salary for Kastel (and other retirees) would be based on their last, higher salaries, not on current starting salaries for unexperienced teachers. *See* van der Bogert dep. at 19. Nina Goldstein, the only teacher who was re-hired into a formal part-time teaching position after her 5 + 5 retirement, was paid based upon her most recent pre-retirement salary. van der Bogert reply aff. ¶ 9. The parties do not ever appear to have discussed the possibility that other retirees who sought further work might agree to accept a lower post-retirement salary.

■ Kastel has not come forward with any evidence that casts doubt on the genuineness (as opposed to the correctness) of the defendants' belief that her part-time salary would be higher than that of a new hire. Nor has she offered any evidence that such cost differences were not truly a source of concern to the district. Thus, we conclude that one of the defendants' proffered reasons

for not re-hiring Kastel—fiscal concerns—has not been rebutted effectively. Nevertheless, we are not necessarily compelled to grant summary judgment on Kastel's age discrimination claim. Under certain circumstances, a plaintiff may "survive summary judgment even though [she] has failed to rebut all of the reasons proffered by the employer for an adverse job action." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 937–38 n. 7 (7th Cir.1996) (citing *Russell v. Acme–Evans Co.*, 51 F.3d 64, 69–70 (7th Cir.1995) and *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 920 (7th Cir.1996)).

We recognize that, as the Supreme Court stated in *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993), "[w]hen the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears." The problem is that here, we cannot conclude that "factors other than age"—*i.e.*, fiscal concerns—were the sole motivation for the defendants' refusal to re-hire Kastel in any capacity. Kastel has submitted some direct evidence of age discrimination, *i.e.*, Ogata's and van der Bogert's brief references to the replacement of older teachers with younger ones, and the defendants' reliance on the stereotype-based "continuity" argument. We place particular weight on the defendants' implicit contention that older workers are necessarily "short-term" workers whose employment will detract from the district's goal of "continuity," a contention for which there is no evidentiary basis and that tends to cast doubt on the genuineness of the other reasons proffered by the defendants. Kastel has also effectively rebutted the district's purported need for full-time rather than part-time speech-language pathologists. On the other hand, although Kastel's rebutted the district's "equity" rationale by showing that it is contradicted by the district's conduct in re-hiring other retirees, that showing also undermines her contention that the defendants were motivated by an animus against older workers.

Viewing all of this evidence together, and drawing all reasonable inferences in Kastel's favor as we must, we conclude that the combination of direct and indirect circumstantial evidence raises a genuine issue as to whether "inaccurate and stigmatizing stereotypes" regarding older workers' commitment and productivity were at least one motivating factor underlying the defendants' decisions. "[N]o one piece of evidence need support a finding of age discrimination, but rather the court must take the facts as a whole." *Huff v. UARCO Inc.*, 122 F.3d 374, 385 (7th Cir.1997). Under the burden-shifting approach enunciated in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) for mixed-motive cases, once a plaintiff has demonstrated that an unlawful reason was a motivating factor in the employer's decision, the defendants have the burden of showing that they would have made the same decision even in the absence of the unlawful reason. Because the defendants have submitted no evidence on this issue, they have not carried their burden on summary judgment to show that there are no issues of material fact.

Frankly, we have grave doubts about whether the mosaic of evidence[5] put forward by Kastel will prove sufficient to sway a jury at trial. However, "[a] judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-movant] on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Because we find that Kastel has raised a genuine issue that must be resolved at trial, we deny the defendants' summary judgment motion as to Count I.

*Count II—Retaliation Claim*

Kastel next claims that the defendants continued to deny her re-employment

---

5. The Seventh Circuit has noted that "a mosaic of evidence which, taken together, would permit a jury to infer discriminatory intent" is one type of circumstantial evidence that may support an employment discrimination claim. *Piraino v. Int'l Orientation Resources, Inc.*, 84 F.3d 270, 274 (7th Cir.1996) (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994)).

in retaliation for her claims of age discrimination. In order to establish a prima facie case of retaliation, Kastel must show that (1) she engaged in statutorily protected expression, (2) she suffered an adverse action by the employer, and (3) a causal link exists between the protected expression and the adverse action. *Alexander v. Gerhardt Enters., Inc.*, 40 F.3d 187, 195 (7th Cir.1994). The defendants contend that the evidence does not establish any of these three elements, let alone all of them.

The undisputed facts show that, on May 31, 1995, Kastel forwarded her resume and a letter intended to serve as an application for post-retirement employment to van der Bogert. Although this application was denied, on September 5, 1995, van der Bogert wrote Kastel in response to her August 15, 1995 re-application, promising to keep the resume Kastel had sent in May "on file." Pl.'s 12(N) Statement, Ex. 5. Shortly thereafter, on September 12, the Winnetka Education Association, the local teacher's union to which Kastel belonged, filed a grievance protesting the defendants' decision not to re-hire Kastel. Kastel filed her EEOC claim, the attachments to which referred to retaliation for claims of age discrimination, on October 17, 1995.[6] Several openings for part-time speech-language pathologists were posted during the fall of 1995, but Kastel was not considered for any of them.

■ There is no evidence that Kastel ever specifically mentioned or complained of age discrimination to any of the defendants. Although she protested the defendants' broad decision not to re-hire any retirees from the time she first learned of it in February 1995, there is no evidence that Kastel told anyone that the defendants were motivated by an animus against older workers until she filed her EEOC charge on October 17. Thus, the defendants cannot have retaliated against her for complaints of age discrimination prior to that date. On the other hand, as of October 17, 1995 she must be considered to have engaged in protected con-

duct. Thereafter, she was denied re-employment while other, less experienced teachers were hired in her place. The temporal proximity between these events gives rise to a reasonable inference that a causal connection may exist. *See McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir.1997) ("a closely related sequence of events is sufficient to present a prima facie case," including the causal link). We also note that although other retirees were re-employed by the defendants, Kastel was not considered for any openings after she retired.

■ Just as with any employment discrimination claim, once a prima facie case of retaliation has been made out, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for the adverse employment action. The plaintiff then must show that the reason is a pretext for discrimination. *See id.* at 797. Here, the defendants protest that the school board initially decided not to re-hire retirees in 1993–94, and simply maintained the same policy consistently thereafter, and that it was this unchanging policy, not any action by Kastel, that led to the refusal to re-hire Kastel after she retired on August 1, 1995. While the overall premise of this argument may be correct, the facts do not support the defendants' contention that they had an unchanging policy of flatly refusing to re-employ any retirees. As mentioned above, retirees other than Kastel were re-hired in various capacities following both the 1993–94 and 1994–95 retirements. These facts at least raise an inference that the defendants were retaliating against Kastel for rocking the boat with her age discrimination claim. In considering a motion for summary judgment, this court cannot weigh competing evidence or engage in credibility determinations. Because both those tasks are required by the evidence submitted on this issue, we find that Kastel has raised a genuine issue of material fact as to whether the defendants' actions after October 17, 1995 constituted retaliation for her complaints of age discrimination.

---

6. Just as they did in their earlier motion to dismiss the complaint, the defendants once again argue that the claim of retaliation was not sufficiently made in the EEOC charge because the box for retaliation was not checked on the cover form. We reject this argument for the same reasons we rejected it in our earlier opinion dated October 31, 1995.

*Count VI—Breach of Contract Claim*

■ The defendants also attack Kastel's claim that they breached a contract (or perhaps broke a promise)[7] when they decided not to re-hire her for the 1995–96 school year. Under Illinois law, a plaintiff must establish the following elements to prevail on a breach of contract claim: (1) the existence of a valid and enforceable contract, (2) performance by plaintiff, (3) breach by defendant, and (4) injury to plaintiff resulting from that breach. *See Berry v. Oak Park Hosp.,* 256 Ill.App.3d 11, 19, 195 Ill.Dec. 695, 701, 628 N.E.2d 1159, 1165 (1st Dist.1993).

■ The defendants argue that Kastel cannot show that there was any valid and enforceable contract, and we agree. Kastel herself admits that she never received a formal employment offer for the 1995–96 school year from anyone. Kastel contends, however, that she was led to believe that she would be re-employed because of various interactions she had with school district personnel: former superintendent Monroe remained silent when Kastel stated her belief that she could be re-employed after retirement, even without a formal guarantee of future employment; and early in 1995 her principal Sandy Karaganis began preparations with her to share her current full-time position with a new teacher, Ghita Lapidus, during the 1995–96 school year. Neither of these interactions can be read as an actual offer, however. Even as to the agreement that Kastel supposed she had with Karaganis to re-hire Kastel after retirement, Kastel had no idea what the terms of the agreement were: "It never got that far, so I really didn't have that understanding." Kastel dep. at 113. No meeting of the minds can be inferred from such circumstances.

■ Kastel next argues that even if the facts do not support the existence of a contract, she has a claim for promissory estoppel. To state a promissory estoppel claim under Illinois law, the plaintiff must establish that he or she reasonably and justifiably relied, to his or her detriment, on an unambiguous promise, and that such reliance was

foreseeable by the promisor. *See M.T. Bonk Co. v. Milton Bradley Co.,* 945 F.2d 1404, 1408 (7th Cir.1991). Once again, the first element—an unambiguous promise—is problematic for Kastel. Neither her discussions with Monroe nor those with Karaganis amount to a clear and definite promise that Kastel should reasonably have relied upon. Accordingly, we grant summary judgment in favor of the defendants on the breach of contract and promissory estoppel claims in Count VI.

*Count IX—Retaliation for Exercise of Pension Rights/Equal Protection*

In her last remaining count, brought against individual defendants van der Bogert and Ogata only, Kastel alleges that those defendants retaliated against her for choosing to exercise her pension rights by refusing to rehire her, and that this refusal discriminated against her in violation of the equal protection clause of the Illinois Constitution. ILL. CONST., art. 1, § 2. Kastel alleges that she, as a member of the class of persons who elected early retirement, was denied the right to equal protection of the laws in that her applications for post-retirement employment and those of other early retirees were not considered by the defendants.

The defendants claim that they are immune from liability under 745 ILCS 10/2–201, the Illinois Tort Immunity Act, which provides that governmental employees performing discretionary functions may not be held liable for injuries resulting from discretionary acts or omissions. We note that Kastel's equal protection claim is based on international actions, and that some Illinois appellate courts (but not others) have held that the Act contains an exception for willful and wanton misconduct, which would include intentional acts. *Compare Johnson v. Mers,* 279 Ill.App.3d 372, 380–81, 216 Ill.Dec. 31, 38–39, 664 N.E.2d 668, 675–76 (2d Dist.1996) (no willful and wanton exception exists); *Collins v. Metcalfe,* No. 95 C 4231, 1996 WL 637592, at *3 (N.D.Ill. Oct.18, 1996) (same,

---

7. Kastel has taken up our suggestion, made in ruling on the defendants' motion to dismiss, that she may be able to state a claim for promissory estoppel if her contract claim fails. We address the viability of her promissory estoppel claim below.

**1084**

relying on *Johnson*) *with Munizza v. City of Chicago*, 222 Ill.App.3d 50, 54, 164 Ill.Dec. 645, 649, 583 N.E.2d 561, 565 (1st Dist.1991) (applying willful and wanton exception); *Amati v. City of Woodstock, Ill.*, 829 F.Supp. 998, 1008 (N.D.Ill.1993) (same, relying on *Munizza*). The Illinois Supreme Court has not ruled on the issue, although it recently held that a similar provision of the Illinois Tort Immunity Act, 745 ILCS 10/3–108, contained no exception for willful and wanton misconduct, applying the same statutory construction approach used in *Johnson. See Barnett v. Zion Park Dist.*, 171 Ill.2d 378, 391–92, 216 Ill.Dec. 550, 556–57, 665 N.E.2d 808, 814–15 (1996).

 We need not resolve this issue, however, because it is plain that Kastel's claim fails on the merits. As we noted in our previous opinion in this case, equal protection challenges based on the Illinois constitution are evaluated under the same standards as similar claims brought under the United States constitution. *Nevitt v. Langfelder*, 157 Ill.2d 116, 124, 191 Ill.Dec. 36, 39, 623 N.E.2d 281, 284 (1993). Applying those standards, a scheme that discriminates against a non-suspect class of people is valid so long as the government has a rational basis for the distinction. *Id.* at 125, 191 Ill.Dec. at 40, 623 N.E.2d at 285. Here, the defendants claim that their decision to treat retirees differently than non-retirees has the requisite rational basis: the belief that employing retirees would cost more, and that not re-hiring retirees would conserve the school district's fiscal resources, thus ultimately advancing the resources available for children's education. Because the distinction created by the defendants was rationally related to a legitimate governmental purpose, *id.* at 126, 191 Ill.Dec. at 40, 623 N.E.2d at 285, Kastel's equal protection claim cannot stand. We grant summary judgment in favor of the defendants on Count IX.

CONCLUSION

For all of the foregoing reasons, the defendants' motion for summary judgment is granted in part and denied in part. The motion is granted as to Counts VI and IX. The motion is denied as to Counts I and II. A

Final Pretrial Order, together with any motions *in limine*, will be due on September 22, 1997. The court will hold a status hearing on September 24, 1997 at 9:00 a.m. for the express purpose of setting a firm trial date for the remaining claims in this lawsuit.