**Thomas COWAN, Plaintiff–Appellant,**

v.

**GLENBROOK SECURITY SERVICES, INC., d/b/a Glenbrook Patrol Services, Defendant–Appellee.**

No. 96–3897.

United States Court of Appeals, Seventh Circuit.

Argued May 28, 1997.

Decided July 23, 1997.

Anthony S. DiVincenzo (argued), Campbell & DiVincenzo, Chicago, IL, Rick M. Schoenfield, Schoenfield & Swartzman, Chicago, IL, for Plaintiff–Appellant.

J. Paula Roderick, Grady B. Murdock, Jr. (argued), Jerome A. Siegan, Neal & Associates, Chicago, IL, for Defendant–Appellee.

Before Cudahy, Eschbach, and Flaum, Circuit Judges.

Flaum, Circuit Judge.

Plaintiff-appellant Thomas Cowan contends that defendant-appellee Glenbrook Security Services, Inc. discharged him because he is African–American and seeks compensatory damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, for the allegedly unlawful termination of his employment. According to Glenbrook, habitual tardiness, not discrimination, was at the root of plaintiff's dismissal. The district court agreed with Glenbrook that plaintiff could not prove that he was fired because of his race; to the contrary, the district court found that the evidence overwhelmingly suggested that plaintiff was terminated because he was chronically late in reporting for work. We agree and now affirm the district court's grant of summary judgment for Glenbrook.

I.

Cowan was employed by Glenbrook as a security guard from October 1990 until May 1992. During the course of his employment, plaintiff was stationed at various companies to provide on-site security. From October 1990 until December 1991, plaintiff was assigned to guard the gatehouse entrance of the Allstate Insurance Company. Between January and March of 1992, he was posted at Dean Witter, except for a couple of weeks in February 1992 when he worked at Robert's Printing Company. Glenbrook transferred him to the G.D. Searle job site in March 1992, where he worked until he was terminated in May 1992. While at G.D. Searle, plaintiff continued to work weekends at the Dean Witter location. Although he was stationed at a variety of posts and under the direction of several supervisors during the course of his employment with Glenbrook, the evidence presented by plaintiff in support of his claim of racially motivated discharge primarily relates to the period between April and December of 1991 when he was under the supervision of Lieutenant Russell Radley.

Plaintiff points to Radley's, interference with his attempts to secure a position with the Postal Service as evidence of Radley's allegedly racially motivated animosity toward him. According to plaintiff's deposition testimony, Radley, after approving plaintiff's request for time off from work to interview with the Postal Service, proceeded to write him up for failing to report to work. Plaintiff was then asked to present a note from the Postal Service verifying where he had been on those days, though other officers were not similarly required to verify their absences. When plaintiff complained about this incident to Radley's superior, Radley threatened to fire him. Because plaintiff believed that Radley also had called the Postal Service to interfere with his obtaining a position, plaintiff confronted him in the cafeteria. During this confrontation, Radley directed a racial epithet at plaintiff. Plaintiff

also testified in his deposition that Radley had on another occasion said that he did not like "niggers." [1]

Cowan also stated at his deposition that he was forced to urinate in a cup because Radley did not allow him to take two of the three required breaks during his eight-hour shift and that his lunch break was shortened, making it necessary for him to eat at his post. Other incidents of alleged discriminatory treatment include Radley's not telling plaintiff that his wife called to tell him that his child was ill and Radley's accusing plaintiff of pouring urine on an Allstate employee's vehicle.

According to plaintiff, he was not the only employee who experienced problems with Radley: "the whole crew" of Glenbrook patrol officers complained about Lt. Radley. Some of these patrol officers, including Chris Latimer, an African–American officer, Ann Gregory and Sharon, both white officers, and another individual, a Latino officer, wrote letters complaining about Lt. Radley. Among those who verbally complained were two Latino officers, one white officer, Vickrume Sandu, described by plaintiff as an Asian officer, and Randy Rai, described by plaintiff as either Hindu or Muslim.[2]

Plaintiff admits that after he spoke with Captain John Sorman, Radley's superior, the problem concerning his being relieved for his scheduled breaks was resolved. On December 13, 1991, Cowan was removed from the Allstate assignment (he had requested a transfer)[3] and did not work for Radley again. Steve Bucklin, Glenbrook's President and CEO, fired plaintiff approximately five months later on May 15, 1992. Cowan contends that he was fired due in large part to the racially motivated reports of tardiness submitted by Radley. Glenbrook maintains that Cowan was fired because he was habitually late for and absent from work.

The parties disagree as to the extent of Cowan's tardiness and absenteeism. According to Glenbrook's personnel records, during the period of approximately 15 months that Cowan worked at Allstate, he was late or absent from work 78 times. Cowan's employee file contains a warning from Lieutenant Kilboy, the supervisor for whom plaintiff worked between October 1990 and April 1991, captioned "First Written Warning–Tardiness," which states that plaintiff "was late one day in October 1990, 2 days in November 1990, 2 days in December 1990 and 4 days in January 1991" and that if plaintiff was late three times or more in a given month, he would be written up for tardiness and this would go in his personnel file. According to plaintiff, he was late only twice during the period covered by Kilboy's warning.

Plaintiff's personnel file also contains two warnings signed by Radley, for whom he worked from April 1991 until December 1991. The first warning, dated April 24, 1991, states: "Today, Officer Cowan was late to work. This is the second day in a row, the third time this month. Per my immediate account supervisor's previous notice of 05 Feb 1991 this behavior cannot be allowed." The second memo, dated August 26, 1991, likewise chronicled plaintiff's alleged tardiness.

> Final warning—T.J. [plaintiff] has six late days ... in August. One sick day, and one personal day ... He was given Sunday (7–3) shift so that he would not be late on Monday A.M.'s ... He was still late this A.M. I appreciate his call to inform me he was to be late ... Even so his tardiness has become habitual. His attendance is poor.

While plaintiff admits that he received and signed the April 24, 1991 warning from Radley, he denies having seen the August 26, 1991 warning (though it does appear to bear his signature as well), and recalls having

---

1. It is not possible to discern from the deposition transcript whether plaintiff was present when this statement was made, as pages are missing from the record. Because the district court considered this statement and defendant has not challenged its admissibility, we will consider it as well.

2. Rai's race is not clear from the record.

3. Plaintiff admits that, when he told Sorman that Radley had called him a "nigger," that he also told Sorman that "there was really nothing to be worried about .... all you have to do is transfer me."

been late on only two occasions during the period he was under Radley's supervision.

In January 1992, Cowan was assigned to work part-time at Dean Witter, where his hours varied. Plaintiff testified at his deposition that Sam Patell, the shift supervisor at Dean Witter, told him that he had been instructed to write plaintiff up for tardiness whenever possible because Steve Bucklin was trying to get rid of plaintiff. Plaintiff also testified that, when he told Sorman that if he did not work a set schedule that he would need to be late occasionally, Sorman told him not to worry about being late. Plaintiff claims that Sorman told him that it was Bucklin who did not want plaintiff assigned to a set schedule. Shortly thereafter, plaintiff met with Bucklin and Sorman regarding his tardiness. Bucklin showed plaintiff a list of days on which plaintiff was allegedly late. Plaintiff informed Bucklin that he had switched hours with other officers on certain days and that it was those officers who were late. Plaintiff claims that Sorman agreed that plaintiff had switched with other officers on certain days. Because plaintiff complained that Dean Witter was too far from his home and that the varied hours made it difficult to be on time for his shift, Bucklin transferred plaintiff on March 2, 1992 to G.D. Searle, a more convenient job site, where he was assigned to the morning shift. Bucklin warned plaintiff that he would be fired if he was one minute late.

Plaintiff's file contains a warning issued shortly thereafter on March 6, 1992 signed by plaintiff's supervisor, John P. Sweeney, stating that plaintiff had been "late two times in the same week." Plaintiff denies having seen this warning, but it does contain what appears to be plaintiff's signature. On April 29, 1992, a "Final Warning" was issued informing plaintiff he was late on 13 of the 29 days he was assigned to the Dean Witter job site, where he had continued to work weekends, and warning that he would be terminated the next time he was late at any job site. Plaintiff admits that he received this warning and, when confronted with the Final Warning at his deposition, did not deny that

he was late on these days.[4] According to Glenbrook, plaintiff was late on May 14, 1992 and was issued another disciplinary report. When plaintiff arrived late on May 15, 1992, Bucklin fired him. Plaintiff admits that he may have been late on May 14 and 15. A white security officer, who had been working at the G.D. Searle job site before plaintiff was assigned there, was given plaintiff's position.

In the period between August 1990 and May 1992, Glenbrook dismissed eleven other security officers based on absenteeism and tardiness, only three of whom were African Americans. Glenbrook's employee handbook provides that tardiness is a ground for termination.

## II.

To prevail on his claim, plaintiff must show "that the basis for [his] termination was the impermissible consideration of race, *i.e.* that a person of another race would not have been discharged under similar circumstances." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1112 (7th Cir.1992). There are two ways a plaintiff bringing a claim under Title VII can establish a prima facie case of discriminatory discharge: either by presenting direct evidence that his termination was racially motivated or by employing the burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Cowan utilized both approaches in attempting to defeat Glenbrook's motion for summary judgment. The district court, however, found that a reasonable jury could not find that plaintiff was the victim of race discrimination. We review this determination de novo and, like the district court, review all evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff. *See Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 346 (7th Cir. 1997).

Although plaintiff's case has several shortcomings, we begin with the general observation that "[a] little common sense is not

---

4. When asked whether he disputed the accuracy of the memo, plaintiff stated that he could not because that was what the memo said and he had seen it.

amiss in a discrimination case." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir.1997). In a nut shell, the evidence in this case shows that plaintiff was continuously late despite having received repeated warnings from at least five supervisors, four of whom, according to plaintiff's own admissions, never discriminated against him on the basis of race. Putting to one side the warnings issued by Radley, which plaintiff maintains were motivated by racial animus, Glenbrook's personnel records show that plaintiff received a formal warning that he was late nine times between October and January 1990 at the Allstate job site under Kilboy; that he was late or absent 15 out of the 29 days he worked at Dean Witter between January and April 1992, prompting a "Final Warning;"[5] that plaintiff was transferred to the G.D. Searle job site closer to his home on the understanding that he would report to work on time; that he was warned by Bucklin that he would be fired if he was one minute late at the G.D. Searle job site, that he subsequently received a warning that he was late twice during the week of March 6, that he was late on March 14 and issued a disciplinary report by Tidwell that references "repeated verbal warnings;" and that he was fired when he reported late for work the following day. On plaintiff's side of the scale, we have his deposition testimony that one of his supervisors for whom he worked five months prior to his dismissal addressed him with a racially derogatory epithet on one occasion and plaintiff's somewhat vague testimony that Radley stated he did not like "niggers."[6] Plaintiff's claim that he was terminated because he is African-American thus appears from the outset to hang by a slender reed. We nevertheless address the arguments raised by plaintiff, viewing the facts in the light most favorable to plaintiff.

## A.

■ We turn first to plaintiff's claim that he presented direct evidence of discrimination. Direct evidence is "evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption." *Plair*, 105 F.3d at 347 (internal quotation omitted). This evidence "must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Randle v. LaSalle Telecomm., Inc.*, 876 F.2d 563, 569 (7th Cir.1989); *see also McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir.1991). In arguing that he has presented evidence that he was terminated due to his race, plaintiff relies on the decisions of this court holding that "[s]ummary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir.1994); *see also Wallace*, 103 F.3d at 1400 (stating that prejudice of employee may be imputed to decision maker if employee, by feeding false information, was able to influence decision). In the instant case, because Cowan does not contend that Radley made the ultimate decision to fire him, direct evidence sufficient to state a *prima facie* case of discriminatory discharge would be evidence that Radley misrepresented the number of days on which plaintiff was tardy (and forged plaintiff's signature on the tardiness warning), or that Radley was otherwise less tolerant of plaintiff's tardiness, because plaintiff is African–American, and that Radley's complaints regarding plaintiff's tardiness were a motivating factor in Steve Bucklin's decision to fire plaintiff. As the district court recognized, plaintiff has failed to produce any such evidence.

■ As mentioned above, plaintiff's evidence of discriminatory intent boils down to his testimony that Radley used derogatory racial expressions on two occasions, one of which was directed at plaintiff when plaintiff accused Radley of interfering with his attempt to secure a position with the Postal

---

**5.** Plaintiff continued to work weekends at the Dean Witter job site after he was transferred on March 2 to the G.D. Searle job site.

**6.** As mentioned previously, it is not possible to tell from the deposition transcript whether plaintiff was present during this incident or in what context this statement was made. Nor does plaintiff repeat this allegation in his brief.

444

Service. This evidence, while relevant to the issue of discriminatory intent, does not relate to the employment decision in question. As we explained in *Smith v. Firestone Tire & Rubber Co.*,

> "stray remarks in the work place, while perhaps probative of sexual harassment [here race], ... cannot justify requiring the employer to prove that its hiring or firing or promotion decisions were based on legitimate criteria." Such remarks, as offered by the plaintiff, when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are made by the decisionmaker in issue.

875 F.2d 1325, 1330 (7th Cir.1989) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 1804–05, 104 L.Ed.2d 268 (1989)) (internal citation omitted); *see also Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir.1996) (stating that "isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process"); *McCarthy*, 924 F.2d at 686 (stating that "[u]nless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of a discriminatory discharge"); *Randle*, 876 F.2d at 569–70 (collecting cases).

Assuming that Radley called plaintiff a racially derogatory name, this fact cannot prove *directly* that Radley, motivated by racial animus, fabricated tardiness warnings and placed them in plaintiff's file or was otherwise less tolerant of plaintiff's tardiness; some nexus between this type of stray remark and the challenged employment decision is necessary. For example, a discriminatory remark made to plaintiff when confronted concerning a discrepancy on his time sheet or a statement made to plaintiff or others that he was writing plaintiff up because he was African–American would demonstrate that Radley likely relied on illegitimate criteria in issuing the tardiness warnings. *See Plair*, 105 F.3d at 347 ("[D]i-

rect evidence would be what [the employer] said or did in the specific employment decision in question: terminating [the employee]."); *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 791 (3d Cir.1985) ("Direct evidence would include statements by the employer to the employee that s/he was being fired because of age."). Absent this nexus, a jury, even if it believed that Radley made the alleged statement, would need to rely on inferences or presumptions to conclude that racial animus played a part in the termination decision. *See Furr v. AT & T Tech., Inc.*, 824 F.2d 1537, 1549 (10th Cir.1987) (discriminatory statements unrelated to challenged employment decision are not direct evidence of causation because inference required).

Plaintiff also argues that his harsh treatment by Radley demonstrates that Radley was racially biased. He has, however, presented no evidence that Radley treated African–American officers less favorably than officers of other races or that he was less tolerant of tardiness by African–American officers. To the contrary, plaintiff's testimony, while describing several instances in which Radley treated him poorly, indicates that this particular supervisor treated the "whole crew" so terribly, apparently without regard to race, that several officers made verbal or written complaints.[7] In sum, none of the evidence presented by plaintiff directly proves that Radley was motivated by racial animus to overstate plaintiff's tardiness/ absenteeism.

In any event, even if we were to assume that the tardiness warnings in plaintiff's file were the result of racial bias, no reasonable trier of fact could conclude that Radley's warnings were a motivating factor in plaintiff's dismissal. Plaintiff's argument that Radley's warnings became part of his employment record has some force and might, given a different factual record, be sufficient to link his termination with the alleged discrimination by his previous supervisor. However, plaintiff's habitual tardiness and flagrant disregard of Bucklin's repeated

---

7. We agree with the district court that plaintiff's complaint did not allege that he was the victim of racially motivated harassment, and, that to the

extent he has attempted to argue harassment as a separate claim, it is unsupported by the evidence.

warnings in the months prior to his dismissal were clearly the cause of his termination. Plaintiff was late or absent 15 out of 29 days at Dean Witter, was transferred in an attempt to improve his punctuality, and nevertheless proceeded to receive three warnings the following month. Even assuming that plaintiff was late twice while working for Radley, instead of the nine times recorded in his personnel file, no rational finder of fact could conclude that these extra days, documented five months prior to his dismissal, played a motivating role in his termination. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").[8]

### B.

▮ Plaintiff does not fare any better in his attempt to utilize the burden-shifting analysis of *McDonnell Douglas*. Under *McDonnell Douglas*, a plaintiff can establish a prima facie case of discriminatory discharge by showing that he is a member of a protected class, that he was discharged, despite having performed his job satisfactorily, and that other similarly-situated employees outside his race were treated more favorably. *See Oates v. Discovery Zone*, 116 F.3d 1161, 1171–72 (7th Cir.1997). Once a plaintiff has established a *prima facie* case, the burden shifts to the defendant to offer a non-discriminatory reason for its employment decision. If the employer satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual, *i.e.*, that race more likely motivated the employer. See *Rush*, 966 F.2d at 1115. Plaintiff argues that the district court erred in finding that Glenbrook's proffered

reason for discharging plaintiff was not pretextual.

▮ We need not reach the issue of pretext, as plaintiff has failed to state a *prima facie* case of discriminatory discharge under *McDonnell Douglas*. To do so, plaintiff must demonstrate that he was performing his job satisfactorily enough to avoid discharge absent racial bias. He clearly was not doing so. While he does dispute whether he was late on as many occasions as Glenbrook maintains, he did not deny that he was tardy while employed at the Dean Witter job site. When presented at his deposition with the April 29, 1992 tardiness warning, plaintiff did not challenge the accuracy of the memorandum, which lists him as having been tardy or absent on 15 of the 29 days he worked at Dean Witter. While he does contend that John Sorman had excused his being late on certain occasions, plaintiff, after speaking with Steve Bucklin prior to March 2, could not have reasonably believed that his tardiness would be tolerated in the future.[9] Glenbrook's records reflect that he was late almost every day while working the weekend shift at Dean Witter in March and April. As mentioned above, he did not take issue with the accuracy of this record, nor did he deny having received this warning, which stated: "This is the final warning for tardiness at any account."

▮ Plaintiff also admits that Steve Bucklin told him that he would be fired if he was one minute late at the G.D. Searle job site and, when asked at his deposition whether he was late on May 14 and 15, plaintiff stated that he "could have been." Even when the facts are viewed in the light most favorable to plaintiff, the record is clear that he was chronically late, that he was warned he would be fired if his attendance did not improve, and that, when it did not, he was fired. "It is not our province to second-guess the business judgment of an employer

---

8. Plaintiff also argues that the district court erred in not placing the burden on Glenbrook to demonstrate that Radley's warning was not a factor in its decision to terminate plaintiff. Even if we were to conclude that Cowan had established a *prima facie* case of discrimination, and therefore place the burden on Glenbrook to demonstrate by a preponderance of the evidence that the same decision would have been made absent

consideration of Radley's warning, we would conclude that Glenbrook had satisfied its burden.

9. Although the date of this meeting is not clear from the record, the parties agree that Steve Bucklin spoke with plaintiff prior to his transfer to the G.D. Searle job site on March 2.

where, as here, it acted on ample legitimate justification for [terminating] the plaintiff." *Smith v. Firestone Tire & Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir.1989).

Although plaintiff maintains that white officers who were similarly tardy were not dismissed, he has not come forward with any evidence to support this allegation. The only evidence in the record is to the contrary: only three of the eleven officers dismissed during the period plaintiff was employed by Glenbrook were African–Americans. Plaintiff's own uncorroborated testimony is insufficient to defeat Glenbrook's motion for summary judgment. The judgment of the district court is therefore AFFIRMED.