Daniel T. GRACE, Plaintiff,

v.

ANSUL, INC., Defendant.

No. 98 C 3172.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 30, 1999.

Glenn R. Gaffney, Glendale Heights, IL, for plaintiff.

Martin P. Greene and Kevin T. Lee of Greene and Letts, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Daniel Grace ("Grace") has sued Ansul, Inc. ("Ansul"), asserting that his termination by Ansul violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 to 634. Grace seeks compensatory and punitive damages in addition to equitable relief, attorneys' fees and court costs.

Ansul now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56. Both sides have complied with this District Court's General Rule ("GR") 12(M) and 12(N),[1] and the motion is fully briefed and ready for decision. For the reasons set out in this memorandum opinion and order, Ansul's motion is denied and the case must go to trial. Denial of the motion also implicates other consequences, discussed in the Conclusion section of this opinion.

### Summary Judgment Standards

Familiar Rule 56 principles impose on Ansul the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir.1997)). While "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broad. Co.*, 957 F.2d 368, 370–71 (7th Cir.1992)), that does not negate the potential for summary judgment in cases where a movant plainly satisfies the Rule 56 standards. In those terms summary judgment is appropriate if the record reveals that no reasonable jury could conclude that Grace was treated in a statutorily prohibited discriminatory fashion (*see Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1402 (7th Cir. 1996) and cases cited there).

As with every summary judgment motion, this Court accepts nonmovant Grace's version of any disputed facts. Hence what follows in the *Facts* section (and in any later factual treatment) is culled from the parties' submissions, with any differences between them resolved in Grace's favor. Other relevant facts, which fit somewhat better into the substantive legal discussion, will be set out later in this opinion.

### Facts

Grace's birthdate is December 25, 1937 (A.12(M) ¶ 1; G. 12(N) ¶ 1), so that when he was fired by Ansul in mid–1997 he was 59 years old. In May 1977 he had begun working for Ansul, a manufacturer and distributor of fire protection products (A.12(M) ¶ 2), as a district sales manager (*id.* ¶ 25). Grace then held various supervisory positions in the company until late 1995, when he was considered for promotion to market development manager for pre-engineered systems (G.12(N) 122). As part of the application process for that job, Grace was required to prepare a marketing plan for Ansul's Micro K product line (*id.* ¶¶ 22, 26).

---

1. GR 12(M) and (N) are designed to facilitate the resolution of Rule 56 motions by calling for evidentiary statements and responses to such statements (in each instance with record citations), thus highlighting the existence or nonexistence of factual disputes. This opinion cites to Ansul's GR 12(M) statement as "A. 12(M) ¶ ___" and to Grace's GR 12(N) response as "G. 12(N) ¶ ___." Citations to the parties' other submissions will also use the "A." and "G." designations.

Ansul Director of Sales Robert Gibbs ("Gibbs," born November 16, 1947 (A. Ex. C at 8)), who had known Grace since the latter's 1977 start at Ansul (A.12(M) ¶ 4), recommended that Grace receive the promotion (id. 151–52). Ansul President Karl Kinkead ("Kinkead") ultimately approved it (id. ¶ 52), and Gibs then became Grace's immediate superior (id. ¶ 3). Gibbs' December 1995 performance review of Grace (G.12(N) ¶ 17; G. Ex. All) reflected high optimism about Grace's promotion:

> If past performance is any indicator, [Grace]]'s success in his new position is virtually guaranteed.

According to an internal Ansul human resources memorandum, Grace's primary responsibility in that new position was "[t]o assume complete, worldwide marketing responsibility for the pre-engineered systems product groups, which includes the identification of new markets and products, developing strategies, marketing and promotional programs, and growing sales, profitability and market share for the assigned product group" (G.Ex. A4). Examples of the fire protection products for which Grace was responsible were the new Micro K product, the R102 restaurant system, the new R103 restaurant system that was ultimately to replace the R102 system, and various vehicle systems.

In September 1996 Gibbs held a meeting to discuss sales development with the three marketing development managers: Grace, David Pelton ("Pelton") and Larry Christensen (G.12(N) ¶ 143). Gibbs was unhappy with Ansul's sales growth for July and August of that year, and according to Grace he directed the three managers to focus their efforts in that area (id.). Grace says that he had no other conversations with Gibbs that month in which Gibbs told him to spend more of his time on the new R103 restaurant system (id. 0¶ 144). Furthermore, except for the arguably quite different focus of that September 1996 marketing meeting, Grace denies that Gibbs criticized his time allocation or any other aspect of his performance at any time between August 1996 and mid-December 1996 (Grace Aff. at 10).[2] Grace does, however, state that in October and November 1996 Gibbs and Kinkead shifted Grace's priorities away from sales growth of existing products and toward the new R103 restaurant and Micro K systems, in addition to the bus system (G.12(N) ¶¶ 173, 175–76).

Ultimately Grace received a December 26, 1996 memorandum from Gibbs that contained a warning that he must improve his performance (A.12(M) ¶¶ 109–10). After criticizing Grace's results, the memorandum concluded (A. Ex. 4 at 2):

> In addition, you must now concentrate all of your efforts into putting together your complete marketing plans for both the next generation [R–103] restaurant systems and the Micro–K product lines. These comprehensive plans must be completed by the end of January so they can be presented to Karl [Kinkead] for approval. Please take these projects very seriously as your failure to finally produce solid, organized marketing plans for these 2 product lines and your continued failure to put together strong market development programs will ne-

---

**2.** Ansul says something very different: that during the fall of 1996 Gibbs had several conversations with Grace about his poor performance (A.12(M) ¶¶ 76, 78), and that in August 1996 Kinkead had told Grace to focus his efforts on the R103 restaurant system and the Micro K system, and correspondingly to spend less time on the bus system (A.12(M) 1189–91). Because Grace denies those assertions in his response to Ansul's GR 12(M) statement, backing up his denial with appropriate record references, the earlier-stated summary judgment standards require this Court to discredit Ansul's version in favor of Grace's. Indeed, from here on out this opinion will reflect Grace's version of the evidence without such qualifiers as "Grace alleges" or "According to Grace" or "Grace claims" or the like—not because this Court is making any factual findings (or course it is not), but simply because the need to credit Grace's evidence is the very essence of a Rule 56 procedure.

cessitate your being replaced in your present market development role.

That month Gibbs met with Grace for about an hour to express those concerns in person (A.12(M) ¶ 11). During that meeting Gibbs also told Grace that Kinkead had said he never would have promoted Grace to marketing development manager if Kinkead had known how old Grace was (G.12(N) ¶ 189).[3] Gibbs denies making that statement (A.12(M) ¶¶ 134–35), but once again Grace's account must be accepted.

In response to Gibbs' concerns, Grace completed a marketing plan for the R103 restaurant system in January 1997 (A.12(M) ¶ 120; G. 12(N) ¶ 216). Gibbs and Kinkead nonetheless decided to terminate Grace (A.12(M) ¶¶ 124–25). They told him of that decision in February 1997 (id. ¶ 126). Pelton, who was born on February 16, 1961 (G.12(N) ¶ 45), took over Grace's duties as marketing development manager for pre-engineered systems (A.12(M) ¶¶ 127–28). Grace ultimately left Ansul on June 30, 1997 (Grace Aff. ¶ 147 and Exs. 20–21), after turning down an asserted "transportation representative" position that did not yet exist at Ansul and that he believed would not have had employee status at the company (G.12(N) ¶ 267).

### Age Discrimination Claim

■ Age discrimination can be established in one of two ways: with direct or circumstantial evidence that the adverse employment actions would not have been taken but for plaintiff's age (the so-called direct method), or with the burden-shifting and inference-creating method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (the so-called indirect method). Here Grace attempts both approaches.[4]

### *"Direct" Method*[5]

To avert summary judgment via the first approach, Grace must produce enough evidence to permit a reasonable jury to conclude that he was terminated because of his age. *Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir.1997) explains the two alternative ways to sustain that evidentiary burden:

> Under the direct proof method, plaintiff must show either an acknowledgment of discriminatory intent by the defendant or its agents, or circumstantial evidence that provides the basis for an inference of intentional discrimination.

Because employers are generally not so accommodating as to memorialize their discriminatory animus in writing or to speak it aloud, most often a plaintiff must rely on circumstantial evidence in the hope of providing "a basis for drawing an inference of intentional discrimination" (*Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994)). But here Grace offers some "smoking gun" evidence—"evidence

---

**3.** Grace also says that Gibbs later made other comments about Grace's and other employees' ages as well, comments that this opinion will discuss in somewhat more detail later.

**4.** In the summary judgment context, of course, Grace's burden is only that of creating reasonable inferences, not one of proof as such (see, e.g., *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir.1994)). But any continued repetition of that lesser burden involves an awkward locution, an awkwardness contributed to by the fact that so much of the caselaw speaks of what an employee must "prove" or "show." Accordingly, whenever this opinion employs terms of that nature it should be understood as mean-

ing Grace's lesser burden of creating reasonable inferences, not that he actually bears the burden of persuasion.

**5.** "Direct" is placed in quotes here (though not later) to signal the confusion that is frequently engendered by the dual role played by the word "direct" in this area of the law. Although it is quite understandable for the caselaw to contrast the "indirect" burden-shifting analysis of *McDonnell Douglas* with what is labeled "direct" proof, a plaintiff can pursue that "direct" course by producing either direct or circumstantial evidence of intentional discrimination (see, e.g., *Kormoczy v. Secretary, U.S. Dep't of Housing & Urban Dev.*, 53 F.3d 821, 824 (7th Cir.1995)).

that can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents" (*id.*)—that Gibbs and Kinkead intentionally and impermissibly took Grace's age into account in deciding to remove him from his position.

■ That "smoking gun" evidence, credited as it must be for Rule 56 purposes, is pretty powerful stuff. As stated earlier, when Gibbs met with Grace in December 1996 about the memorandum charging him with poor performance, Gibbs specifically reported that Kinkead had told Gibbs that he (Kinkead) never would have promoted Grace to marketing development manager if he had realized how old Grace was.[6] And in late 1996 or early 1997 Gibbs also told Grace and Ansul employee Bill Borland (who Grace says is his own age) something to the effect of "We have to get rid of all you 59 year-olds" (Grace Dep. 123). In those respects A. Mem. 9 really misses the point in arguing that, with Grace having been hired close to his fortieth birthday back in 197 Kinkead had to be aware of Grace's approximate age if not his exact age: Simply because ADEA has chosen to protect employees from age 40 onward does *not* mean that an employee must show the employer's age bias over that wide spectrum—it is obviously enough if the prohibited animus kicks in at *any* point where the employer thinks "that's too old."

To sustain a claim that an employee's termination was motivated by anti-age animus, a good many cases have said that a proffer of direct evidence "must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question" (*Cowan v. Glenbrook Sec. Servs., Inc.,* 123 F.3d 438, 443 (7th Cir.1997), quoting *Randle v. LaSalle Telecomm., Inc.,* 876 F.2d 563, 569 (7th Cir.1989)). For example, "comments about discrimination in hiring may not suffice if the case involves a *discharge*" (*Indurante v. Local 705, Int'l Bhd. of Teamsters,* 160 F.3d 364, 367 (7th Cir.1998) (emphasis in original, with citation omitted)).[7]

Gibbs' testimony relating Kinkead's displeasure with having promoted an older employee does not explicitly refer to Grace's termination. But Grace was told about it during a meeting in which Gibbs was placing him on the probationary status that preceded his ultimate dismissal. It also reflected age animus directly against Grace on the part of Ansul's President, who was the ultimate decisionmaker as to Grace's firing. It certainly cannot be labeled as a "stray remark" unrelated to the decisional process, the term that our Court of Appeals has sometimes attached to discriminatory statements that it finds inadequate to make out a prima facie case of discrimination under the direct method

---

6. A. Mem. 6 n. 1 challenges that statement as "problematic because the statement is double hearsay." It is not, of course. Gibbs' statement is nonhearsay under Fed.R.Evid. 801(d)(2)(D), while Kinkead's is nonhearsay under Fed.R.Evid. 801(c)—it is offered and admitted to prove that Kinkead *made* the statement (not necessarily the truth of the statement). As such, it is evidence of Kinkead's discriminatory mindset. And just as in n. 2, this opinion must disregard Gibbs' denial of having made his statement to Grace. Similarly, the next sentence of the text treats as a credited fact another part of Grace's testimony.

7. This Court must confess to some puzzlement on that score. It had ruled just that way in *Huff v. UARCO,* 925 F.Supp. 550, 556 (N.D.Ill.1996), following what it understood to be established circuit precedent, only to find that analysis rebuffed by our Court of Appeals (122 F.3d at 384–86). It is worth noting that the same judge who wrote for the court in *Huff* later dissented in *Indurante,* 160 F.3d at 368—citing (*id.* at 369) that judge's earlier opinion in *Huff* in support of that dissent. What then are the district judges who labor in the vineyards, and who are called upon to decide summary judgments or to craft jury instructions for trial, to view as Seventh Circuit law? For the forthcoming *Huff* trial it would seem that law of the case considerations would compel adherence to what was said on appeal there, despite the strong contraindications in such later cases as *Indurante*—but quaere as to the operative rules in other district court cases such as this one.

(see, e.g., *Cowan*, 123 F.3d at 444).[8] Instead, despite the few months' temporal separation of that statement from the decision to terminate Grace, it would be reasonable to infer that the statement was causally related to that termination (by contrast with the situation in *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996)). And Gibbs' second statement—although perhaps possible to read (with inferences favoring Ansul rather than, as is required for now, in Grace's favor) as a meaningless office barb—speaks directly to firing Grace because of his age.

All of that, taken together with the just-referred-to favorable inferences, must be viewed as having provided ample evidence to defeat summary judgment under the direct method. Nonetheless, even though further analysis might be thought of as fashioning a belt to supplement Grace's already adequate suspenders, this opinion will go on to look at the indirect method of proof in somewhat briefer compass. In that regard, it is unsurprising that much of the evidence Grace presents as circumstantial evidence of intentional discrimination strongly bolsters his argument under the indirect method too.

*Indirect Method*

 Under the indirect approach Grace must establish a prima facie case by demonstrating that (1) he was a member of the protected class (age 40 or over), (2) he was performing his job to his employer's legitimate expectations, (3) he was subjected to an adverse employment decision and (4) younger and similarly situated employees were treated more favorably (*Richter v. Hook–SupeRx, Inc.*, 142 F.3d 1024, 1028 (7th Cir.1998)). If Grace can thus demonstrate his prima facie case a rebuttable presumption of discrimination arises, and the burden shifts to Ansul to articulate some non-discriminatory reason

for its actions (*id.*). If Ansul does so the presumption dissolves, and Grace must establish that Ansul's asserted reason was pretextual (*id.*).

Although those steps provide a useful analytical tool, there is no need in this case to follow their ping-pong pattern. As this Court (like others) has noted more than once (*Moore v. NutraSweet Co.*, 836 F.Supp. 1387, 1395 (N.D.Ill.1993) (citations and internal quotation marks omitted)):

> [T]he plaintiff's prima facie showing in these cases frequently cannot be analyzed wholly discretely from the plaintiff's showing of pretext, so that it is preferable to collapse the inquiry and focus on the showing of pretext, a position that our Court of Appeals also has taken on occasion (see, e.g., its decision affirming this Court in *McCoy*, 957 F.2d at 372).

Just as in such cases as *McCoy* (which our Court of Appeals continues to cite—and quote—with great regularity in this area of the law) and other Seventh Circuit cases taking the same approach, this opinion focuses on whether Grace has met his burden of creating a reasonable inference that Ansul's stated reason for dismissing him was a pretext for age-based discrimination.

 To establish pretext, Grace must ultimately show by a preponderance of the evidence either that Ansul was more likely motivated by a discriminatory reason than by its proffered reason, or that its proffered reason is unworthy of credence (*McCoy*, 957 F.2d at 372). Grace's evidence creates several issues of fact material to that analysis, thus defeating summary judgment under this alternative approach as well.

First and most obviously, Gibbs' various statements about the age of Ansul employees (including Grace) support Grace's argument that Ansul's stated reason for fir-

---

8. Grace also points to a different statement by Gibbs that might perhaps be viewed, by a court so inclined, as a "stray remark" that does not provide direct evidence of discrimination. In January or February 1997 Gibbs had said (in reference to the termination of Ansul district manager Tim Wilshire), "that's what happens when you hire old guys" (Grace Dep. 118).

ing him was a pretext. According to *Huff*, 122 F.3d at 385, remarks unrelated to the specific employment decision at issue, when used in conjunction with other evidence, can still support an inference of discrimination. Under that reading, even if the statements to which Grace testified were to be viewed as thus unrelated (a suspect reading, because it would appear to draw inferences in the wrong direction for Rule 56 purposes), a reasonable jury could find that Ansul discriminated against Grace because of his age.

That is so because, again to follow the *Huff* formulation, the evidence of Gibbs' statements does not stand alone. Grace presents several other pieces of evidence to challenge Ansul's proffered reason for firing him. Although Ansul argues that it terminated Grace because of his performance deficiencies as marketing development manager for pre-engineered systems, the parties present two very different stories about the events in the fall of 1996.

Grace's evidence is that he was told to focus his efforts on sales growth until October or November 1996, when his superiors shifted his emphasis toward the new R103 and Micro K products. Moreover, the holdup in the introduction of those two products was due only to delays in research and development, over which Grace had no control or influence (G.12(N) ¶¶ 68, 75, 80, 90). Relatedly, Gibbs and Kinkead had given Grace no indication that they were dissatisfied with his performance until late December 1996, when Gibbs gave Grace the warning memorandum demanding quick results. That version is buttressed by testimony from other high-level Ansul employees that they had no knowledge of complaints about Grace's perfor-

mance and that they themselves were satisfied with his performance (e.g., *id.* ¶¶ 85, 122, 134, 139, 218–19, 224). In fact Grace had drafted a marketing plan for the Micro K product a full year earlier, and he then provided Gibbs and Kinkead with a marketing plan for the R103 restaurant system by the deadline given in the December 1996 memorandum. Nonetheless he was terminated shortly thereafter—and he was replaced by someone in his mid–30s.

As against that, Ansul offers up testimony that Grace's performance as marketing development manager fell short of Gibbs' and Kinkead's expectations almost from the start, and that they informed him of their dissatisfaction repeatedly before placing him on probation in December 1996. In that respect Grace is said to have been told early on that he should focus on the R103 and Micro K systems but that he disobeyed that order by placing priority on other projects, such as the bus system, thus causing problems for Ansul in its attempts to introduce the new systems to its customers.[9]

Clearly it is for a jury to decide which of those stories rings true. Taking the facts in the light most favorable to Grace, as this Court must do in assessing a motion under Rule 56, this Court finds no doubt that a reasonable jury could fairly decide that Ansul's stated reason for firing him was pretextual and that he was really fired because of his age. So Ansul's motion for summary judgment must be denied under the indirect as well as the direct approach.

*Conclusion*

Because Grace has presented evidence that creates genuine issues of material fact, Ansul's motion for summary judg-

9. Ansul further contends that it should be entitled to a presumption of nondiscrimination because it promoted Grace while he was in the protected age class (*EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 152 (7th Cir.1996)). But that argument deserves a "So what?" response, not only because of the point made earlier that bias affecting an over–40 employee is equally prohibited at whatever age it rears its ugly head, but importantly because such a presumption determines the winner only in the absence of evidence or in the rare situation where the evidence is in total equilibrium. By contrast, where as here each side presents evidence to be weighed in the scales, that weighing is of course for a jury, not for a court under Rule 56.

ment must be denied whatever analytical path is taken. And so it is. But the discussion cannot fairly end there, for this case provides a classic illustration of a Rule 56 motion that should never have been filed to begin with.

For some time this Court has been urging counsel to think hard before they set foot on the arduous path—arduous and expensive for the litigants, arduous for the court [10] marked out by GR 12(M) and 12(N), rather than taking the alternative route of preparing for trial and trying the case. Most recently it has reduced that exhortation, in somewhat summarized and abbreviated form, to writing: Appendix A to this opinion is reproduced from another case. In this instance it surely appears that Ansul's conscientious counsel, had they viewed the evidence post-discovery through an objective lens, had to know that this case comes down to a swearing contest that would necessarily doom any Rule 56 motion.[11]

Ansul may perhaps be willing to bear the twofold costs of an unsuccessful summary judgment motion, even though doomed to inevitable failure from the start, and then followed by the trial that was always necessary to resolve this lawsuit. But even if Ansul is willing to do so itself, there would seem to be no warrant for its having thrust those twofold costs on Grace and his lawyers, who were given no opportunity for an informed decision on the matter. Once Ansul's Rule 56 and GR 12(M) bullet left the muzzle, it could not be stuffed back in—there was no choice for Grace other than to respond in kind.

It is true that if Grace were ultimately to prevail on the merits, the substantial incremental time and expense that has been incurred on the current motion, over and above the time and expense of the ensuing trial, should be recoverable under ADEA as part of reasonable attorneys' fees and expenses. But what has been said here is equally true if Grace loses at trial, in which event there can be no such award.[12] And that point gains added force where, as evidenced by the thrust of the statutory provisions and the uniform case law dealing with fee-shifting, Congress and the courts have accorded meaningful recognition to the imbalance of bargaining power that typically exists in employment discrimination cases.

This problem need not be remediless in consequence of our justice system's having opted for what has historically been termed the American Rule. That American Rule is scarcely a "rule" in the normal sense—thus its multitudinous exceptions in the mid–1980s were catalogued by Justice Brennan, dissenting in *Marek v. Chesny,* 473 U.S. 1, 43, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985). But for this case no such statutory remedy is available if Grace were to be an ultimate loser in the litigation—with one possible exception: Ansul's attorneys are directed to submit a memorandum on or before September 13, 1999 as to why in their view 28 U.S.C. § 1927 should not apply to provide Grace (and his counsel) with relief against what has taken place

---

**10.** If a judge's time and that of the judge's clerks, which are by definition finite in amount and are required to be allocated among the hundreds of cases that are on the typical judge's calendar, are properly viewed as a cost as well, the Rule 56 path is expensive to the court too. Again this opinion provides a living example of that.

**11.** Lest this be viewed as an overstatement, it is worth noting that A.Mem. 8–9 is a section of its brief in support of the motion captioned "The alleged Age Comments are not Credible." That argument (and like arguments advanced elsewhere in Ansul's Memorandum)

flies directly in the face of the home truth "that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial" (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

**12.** This is as good a place as any to emphasize the obvious point that this Court is expressing no view at all as to the merits—as to how a jury should resolve the parties' conflicting evidence.

here. And Grace's attorneys may if they wish tender a simultaneous submission on the subject, although they may prefer to await the Ansul submission to see whether they regard a response as necessary.

### Appendix

Even as the tide of Fed.R.Civ.P. ("Rule") 56 motions for summary judgment continues to rise (a tide that tends to reach the high water mark in employment discrimination cases, where counsel for defendant employers seem—though indiscriminately[1]—to view summary judgment as the wave of both the present and the future), this Court has become increasingly concerned that insufficient attention is being given to the alternative of eschewing the Rule 56 route in favor of preparing for and conducting trials. It is of course true that the climate of hospitality toward summary judgments has improved dramatically since the trilogy of Supreme Court decisions in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but the concept of increased judicial receptivity to Rule 56 motions has tended to promote insufficient attention on the part of counsel to a thoughtful cost-benefit approach to the available alternative of trial.

One factor that seems to escape even counsel who claim to look at the question through cost-benefit lenses is that the proper analysis is not simply a function of looking at the costs of preparing a Rule 56 motion after discovery is completed (say X) as against the costs of preparing for and going to trial after the completion of discovery (say Y), so that if $Y > X$ the decision to pursue summary judgment is supposedly a sound one. For purposes of any such comparison, of course (whether in the oversimplistic matchup just described or in terms of the more accurate analysis set out later in this Appendix):

1. X is the sum of the cost of post-discovery lawyer time plus the cost of the time of employer personnel that must be devoted to the Rule 56 motion. In both of those respects, for better or worse, this District Court's General Rule ("GR") 12(M) (which has its counterpart in many if not most other District Courts) must be acknowledged to be highly burdensome, fashioned as it is to highlight the identification of whether any genuine material (that is, potentially outcome-determinative) facts are in dispute in the case. It is of course understood that the presence of such factual disputes will defeat summary judgment, just as their absence will permit the entry of summary judgment. To that end, rules such as GR 12(M) are properly intended to assist District Judges in making that determination, rather than having to engage in what our Court of Appeals has described as "hunting for truffles" (*United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991)). Importantly, every summary judgment motion also requires a memorandum of law (usually extensive) that points to both the relevant evidence and the applicable law—and of course the moving defendant must prepare and file two such memoranda, as against the responding plaintiff's single memorandum.

2. It is equally true that Y is the sum of the cost of post-discovery lawyer time plus the cost of the time of employer personnel devoted to the preparation for and conduct of trial. But in that respect this Court *never* requires the filing of trial briefs in employment discrimination cases (it seldom if ever requires trial briefs in any other class of case either). It also tends to require quite skeletal proposed final pretrial orders ("FPTOs"), especially so in employment discrimination cases. And GR 5.00, which prescribes the ground rules for preparation of the FPTO as well as

---

**1.** Bad pun intended.

its required content, requires the lawyer for plaintiff (in employment discrimination cases, the employee's or ex-employee's lawyer)—rather than the defense counsel, who must bear the bulk of the time and expense incurred in pursuing the Rule 56 alternative—to wield the laboring oar in generating the FPTO.

What is oversimplistic about the X v. Y comparison? It fails to recognize that all too often even a good faith belief by defense counsel that no outcome-determinative factual disputes lurk in the parties' countersubmissions may be wrong. Remember in that regard that the law commands the court to draw all reasonable inferences in favor of the party opposing summary judgment—and in the most frequently encountered scenario of the employment discrimination lawsuit, that means in favor of the plaintiff employee or ex-employee. As if that were not enough, remember also that judges are regrettably not infallible either (despite the judicial temptation to think otherwise), so that even a judge's *mistaken* belief in the existence of a material factual dispute will also result in the denial of summary judgment. And when either of those things happens, the case must go to trial in any event.[2] One factor, though not a major one, does temper the comparison disfavoring summary judgments somewhat: It is of course true that some of the cost of that subsequent trial will already have been incurred in the summary judgment preparation, so that the incremental cost of the trial is not fully Y but rather a major percentage of Y.[3]

One final piece of the analysis remains: While the summary judgment motion always creates the certainty of a later trial if summary judgment is not granted for any reason, there is no corresponding risk implicated in the alternative decision to go to trial—for a trial will necessarily produce a judgment. In fact, if a defendant is really comfortable (*and right*) in its view that it should prevail on summary judgment, its consequent potential for prevailing on a successful Rule 50(a) motion at the close of plaintiff's case[4] will carry with it a trial cost meaningfully less than the entire Y that is hypothesized here.

So how does all of this play out? Suppose that the likelihood that a true material factual issue is present is "a" (expressed as a percentage), while the possibility that a trial judge will mistakenly perceive the existence of such a factual issue is "b" (another percentage term). Thus "a + b" represents the percentage likelihood that the summary judgment motion will fail and a trial must therefore follow. Then suppose further that the cost of a trial after an unsuccessful summary judgment motion is pY where "p" also represents a percentage. On those assumptions a decision to seek summary judgment rather than proceeding directly to trial is economically sound only if:

$$X + (a + b) pY < Y$$

It remains to put a few numbers into that inequality to get a sense of the problem in practical terms. It seems reasonably conservative to hypothesize a 15% figure for "a" (there are certainly a good many cases in which the chances of winning summary judgment are not better

---

**2.** Denials of summary judgment motions are nonappealable. So if a summary judgment motion were to be wrongfully denied, that error could be corrected only after the case has gone to trial and hence to a final (and therefore appealable) judgment.

**3.** There are two reasons that "major percentage" is the proper qualifying term here. For one thing, the very different structures of a summary judgment motion on the one hand (a totally paper exercise) and a trial on the other tend to minimize the common elements

of cost involved. And for another, it should again be recalled that the relevant comparison is between the costs incurred under the two alternatives *after* all discovery has been completed, so that the largest element of commonality does not enter into the equation at all.

**4.** *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505 teaches that the Rule 56 substantive standard is identical to that under Rule 50(a).

than 5 out of 6, or 6 out of 7, no matter how optimistic defense counsel may be) and a 5% figure for "b" (which represents only a 1 in 20 chance of judicial error in seeing a factual issue, even though it might ultimately be determined that none exists). And taking into account that by definition the effective comparison (some function of X and Y) assumes the completion of discovery before *either* summary judgment or trial is essayed, the work involved in preparing the witnesses and conducting the live trial is not at all substantially reduced by having done the paperwork of an unsuccessful summary judgment motion—so it also seems conservative to treat "p" as (say) 90%.

On those assumptions the inequality becomes:

$$X + (.15 + .05) \times .90Y < Y$$

Carrying out the indicated operations produces:

$$X + .18Y < Y$$

Or, to collect the Y terms:

$$X < .82Y$$

In other words, the estimated post-discovery summary judgment cost must be about 80% of the estimated post-discovery trial cost before summary judgment represents a good bet. If we then add into the analysis the very substantial saving in trial time if the party who would otherwise have pursued the summary judgment route is *right* in his or her evaluation, so that a successful Rule 50(a) motion at the end of plaintiff's case will save the cost of having to put on the defense case, the disparity in numbers is greatly increased.

If for example that were to save 25% of the total post-discovery cost of a trial, the right side of the inequality would become .75Y rather than Y:

$$X + .18Y < .75Y$$

Or, again to collect the Y terms:

$$X < .57Y$$

Hence the aggregate post-discovery costs of pursuing summary judgment would have to be something less than 60% of the aggregate post-discovery cost of a full-blown trial before the investment of time and effort in the former would represent a truly sound investment.

In short, it must be recognized that the usual overly simplistic comparison of the costs and risks of a summary judgment motion as against the trial alternative is totally misleading. All too often it is born of defense counsel's misunderstanding of the real components of a cost-benefit analysis, also too frequently coupled with counsel's apparent fear of juries (an ungrounded fear, in this Court's experience). This Court will therefore continue to seek to press defense counsel to consider the ultimately conservative alternative of trial rather than summary judgment in appropriate cases.